**SOUTHFORK SYSTEMS, INC., Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee,**

and

**State of Texas, acting through the Texas Commission for the Blind, Defendant–Appellee.**

**No. 96–5136.**

United States Court of Appeals, Federal Circuit.

April 14, 1998.

William R. Purdy, Ott & Purdy, P.A., Jackson, MS, argued, for plaintiff-appellant.

Janene M. Marasciullo, Attorney, Civil Division, Commercial Litigation Branch, U.S. Department of Justice, Washington, DC, argued, for defendant-appellee, United States. On the brief were, Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Sharon Y. Eubanks, Deputy Director, and Stephanie M. Jackson, Trial Attorney.

Peter A. Nolan, Sheinfeld, Maley & Kay, P.C., Austin, TX, argued, for defendant-appellee, State of Texas.

Before NEWMAN, RADER, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

This appeal arises out of a challenge to a pre-award procurement decision by the Department of the Air Force (Air Force). In April of 1995, the Air Force issued Solicitation Number F41636–95–R–0075 (the Solicitation) seeking contract proposals for the management and operation of the enlisted personnel cafeteria complex at Lackland Air Force Base in Texas. The Solicitation stated that the procurement was being conducted in accordance with the Randolph–Sheppard Vending Stand Act (RSA), Pub.L. No. 74–732, 49 Stat. 1559 (1936), as amended by Pub.L. No. 93–516, §§ 200–211, 88 Stat. 1617, 1623 (1974), codified at 20 U.S.C. §§ 107–107f (1994).[1] The RSA accords priority in the awarding of food service contracts to blind persons found qualified to operate cafeterias on government property.

After evaluating the proposals submitted in response to the Solicitation, the contracting officer included the proposal of the Texas Commission for the Blind (the Commission) within the competitive range. Pursuant to the RSA, the Air Force thereupon entered into direct negotiations with the Commission, with the intention of awarding it the contract. Southfork Systems, Inc. (Southfork), the incumbent operator of the cafeteria and one of the six other offerors found to be within the competitive range, lodged a protest with the contracting officer. In its protest, Southfork challenged both the Commission's status as an offeror under the Solicitation and the Air Force's decision to enter into direct negotiations with the Commission. When the contracting officer failed to respond to the protest, Southfork filed suit in the United States Court of Federal Claims, seeking declaratory and injunctive relief disqualifying the Commission as an offeror and barring award of the contract to it. Southfork now appeals the judgment and order of the court, No. 96–41C (Aug. 29, 1996), (i) dismissing Southfork's complaint for failure to state a claim upon which relief could be granted, and (ii) holding on motion for summary judgment that Southfork had not demonstrated a viola-

tion of the Air Force's obligation to fairly and honestly consider Southfork's proposal. We affirm.

## BACKGROUND

### I.

The RSA states that, "[f]or the purposes of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting, blind persons licensed under the provisions of this chapter shall be authorized to operate vending facilities on any Federal property." 20 U.S.C. § 107(a).[2] The RSA further states that, in the award of contracts for vending facilities, priority shall be granted to "blind persons licensed by a State agency." 20 U.S.C. § 107(b). The Secretary of Education administers the RSA and is authorized to prescribe regulations to effectuate the purposes of the statute. *See id.* The Secretary is responsible for designating in each state an agency to issue licenses to blind persons for the operation of vending facilities. *See* 20 U.S.C. § 107a(a). A designated State licensing agency (SLA) is required to give preference to blind persons who are in need of employment when issuing a license for the operation of a vending facility. *See* 20 U.S.C. § 107a(b). The Commission is the designated SLA in Texas.

Regulations promulgated by the Department of Education's Office of Special Education and Rehabilitation Service are found at 34 C.F.R. §§ 395.1–395.38 (1997). The regulations provide that an SLA can respond, on behalf of a licensed vendor, to a solicitation for offers for cafeteria services and that the licensed vendor will be given priority in award if the SLA's offer is ranked among the qualified submitted proposals:

> (a) Priority in the operation of cafeterias by blind vendors on Federal property shall be afforded when the Secretary deter-

---

**1.** Unless otherwise indicated, all references are to the 1994 version of the United States Code.

**2.** A "vending facility" can include automatic vending machines, cafeterias, snack bars, cart services, shelters, and counters. *See* 20 U.S.C. § 107e(7).

mines, on an individual basis, and after consultation with the appropriate property managing department, agency, or instrumentality, that such operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided employees, whether by contract or otherwise. Such operation shall be expected to provide maximum employment opportunities to blind vendors to the greatest extent possible.

(b) In order to establish the ability of blind vendors to operate a cafeteria in such a manner as to provide food service at comparable cost and of comparable high quality as that available from other providers of cafeteria services, the appropriate State licensing agency shall be invited to respond to solicitations for offers when a cafeteria contract is contemplated by the appropriate property managing department, agency, or instrumentality. Such solicitations for offers shall establish criteria under which all responses will be judged. Such criteria may include sanitation practices, personnel, staffing, menu pricing and portion sizes, menu variety, budget and accounting practices. If the proposal received from the State licensing agency is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award, the property managing department, agency, or instrumentality shall consult with the Secretary as required under paragraph (a) of this section.

34 C.F.R. § 395.33. After contract award, the SLA remains involved and "shall attempt to resolve day-to-day problems pertaining to the operation of the vending facility in an informal manner with the participation of the blind vendor and the on-site official responsible for the property." 34 C.F.R. § 395.36(a).

Regulations promulgated by the Department of Defense (DOD) to implement the RSA give preference to SLA proposals in order that "[t]he blind will be given a priority in award of contracts to operate cafeterias." 32 C.F.R. § 260.3(b) (1996). Under its regulations, DOD is responsible for ensuring that "operators are in fact State licensed blind persons and that sighted employees and assistants are utilized only to the extent reasonably necessary." 32 C.F.R. § 260.4(c)(4). DOD's regulations further provide that "[i]f the State licensing agency submits a proposal and it is within the competitive range established by the contracting officer, the contract will be awarded to the State licensing agency" unless "the on-site official determines that award to the State licensing agency would adversely affect the interests of the United States." 32 C.F.R. § 260.3(g)(1)(ii)-(iii). A determination that according priority to the SLA would be adverse to the interests of the United States must be fully documented and sent to the Secretary of Education for review. See 32 C.F.R. § 260.3(f)(2).

II.

The Air Force issued the Solicitation on April 27, 1995. The Solicitation included a provision regarding preference for SLAs:

PREFERENCE FOR THE STATE LICENSING AGENCY FOR THE BLIND (SLA): This acquisition is being conducted in accordance with the Randolph–Sheppard Vending Facilities Act ... as implemented by [Air Force Instruction] 34–206, Vending Facility Program for the Blind on Air Force Property[,] and DoD Directive 1125.3[,] which give the SLA priority in award of contracts to operate cafeterias on DoD controlled property. If the SLA submits a proposal that is within the final competitive range established by the Contracting Officer, the contract will be awarded to the Texas Commission for the Blind unless the Center Commander determines that award to the SLA would adversely affect the interests of the United States and the Secretary of the Department of Education approves the determination, or unless the Center Commander determines, after conferring with the Commander, Air Force Services Agency ... and the Secretary of Education agrees, that the blind vendor does not have the capacity to operate a cafeteria in such a manner as to provide food services at a comparable cost and of a comparable high quality as that available from other providers of cafeteria services.

Under a section titled "PROCESS," the Solicitation explained the process for reviewing and evaluating each submitted proposal. The Air Force would first eliminate those proposals "that fail to provide all information relative to data, format, and certifications." The remaining proposals then would be compared to determine a competitive range:

A competitive range may be made and will consist of all proposals which are considered to have a reasonable chance of being selected for award. If needed, a competitive range determination will be made and written and/or oral discussions will be conducted with all offerors within the competitive range. More than one competitive range determination may be made. The determination as to whether the SLA is in the competitive range for purposes of award may be made as late as immediately prior [to] the request for best and final offers. Upon completion of written and/or oral discussions, best and final offers will be requested. The government may reject any or all proposals and waive minor informalities or minor irregularities in proposals received, or may make award without discussions. Accordingly, each initial offer should be submitted on the most favorable terms from both a technical and price standpoint.

Under the heading *"EVALUATION CRITERIA,"* the Solicitation stated that, in determining whether a proposal had a reasonable chance of being selected, the Air Force would evaluate the proposal through "general criteria, specific criteria and assessment criteria." For each of these criteria, the Solicitation provided, the Air Force would compare offerors' proposals to evaluation standards.

The Solicitation's "general criteria" encompassed four distinct evaluations. The Air Force would make an evaluation of any terms and conditions proposed by an offeror as substitutions and/or additions to terms and conditions included in the Solicitation. Each proposal also would be evaluated to determine whether its offeror was capable of performing within technical, cost, and schedule constraints. In addition, each offeror's present and past experience on recent contracts would be reviewed to aid the Air Force in determining whether the offeror had demonstrated the ability to comply with contract requirements. Finally, an SLA requesting priority under the RSA would be subject to "compliance review" and would have to be able to show, as far as its proposal was concerned, "that economic opportunities to the blind are enlarged, and ... that sighted employees or assistants are utilized only to the extent reasonably necessary."

The Solicitation stated that the "specific criteria" component was for the purpose of evaluating technical, price, and socioeconomic considerations in the proposals, while the "assessment criteria" component constituted the benchmark against which each proposal's technical factors would be evaluated.

### III.

The Commission and Southfork both submitted proposals in response to the Solicitation, and after evaluation both of their proposals were deemed to be among the seven proposals that the Air Force determined to be within the competitive range. The Commission's proposal stated that, if the Commission were awarded the contract, an individual blind vendor, who was licensed by the Commission, would manage the Lackland cafeteria complex. The proposal further stated that a food service company would work with the blind vendor as a subcontractor and that it would train the vendor and would provide support and assistance in the operation and management of the complex.

By letter dated December 22, 1995, the contracting officer notified Southfork that initial technical evaluations had been completed and that the Commission's proposal had been found to be within the competitive range. Therefore, the contracting officer wrote, the Air Force would enter into direct negotiations with the Commission for the contract, as contemplated by the RSA.

### IV.

Southfork filed a protest with the contracting officer on January 9, 1996, contesting both the Commission's status as an offeror and the contracting officer's decision to give

preferential treatment to the Commission under the RSA. When the contracting officer failed to respond to the letter of protest, Southfork commenced suit in the Court of Federal Claims seeking declaratory and injunctive relief.

Southfork's complaint eventually was amended to include twelve counts. In Counts I through V, Southfork broadly challenged the propriety of the Commission's status as an offeror. In Count I, Southfork alleged that the Commission did not qualify as a "blind person" as defined in the RSA. In Counts II and III, it asserted that regulations promulgated by the Secretary of Education (34 C.F.R. § 395.33(b)), and by DOD (32 C.F.R. § 260.3(g)(1)(ii)-(iii)), exceeded the authority granted under the RSA because they contemplated granting preferences in contract award to SLAs, which, according to Southfork, were not "blind persons" as defined in the statute. In Count IV, Southfork alleged that the RSA did not cover the Solicitation because the Lackland facilities did not qualify as "cafeterias" as defined in the regulations promulgated by the Secretary of Education. In Count V, Southfork asserted that the Commission was not authorized by the Texas Constitution or by any Texas statute to enter into a contract to operate dining facilities at Lackland Air Force Base.

In Counts VI through XI, Southfork challenged the contracting officer's application of the Solicitation's evaluation criteria. In Count VI, it alleged that, in determining whether the Commission was within the competitive range, the Air Force had deviated from the requirements of the Solicitation by ignoring the Commission's lack of experience and by considering instead the experience of the subcontractor who would support the blind individual managing the cafeteria complex. The substance of Southfork's claim in Count VII was that the Commission's proposal did not satisfy the requirements of the RSA because, while the purpose of the statute was to afford employment opportunities to "blind persons," the Commission contemplated using "subcontractors and/or consultants" who were not blind. In Count VIII, Southfork charged that the Air Force had failed to apply the Solicitation's evaluation criteria in a uniform and consistent manner and had given improper advantage to the Commission's proposal. Specifically, Southfork asserted that the Air Force had failed to penalize the Commission's proposal for the same deficiencies that resulted in unsatisfactory ratings for other proposals. In Count IX, Southfork asserted that the Commission should have been excluded from the competitive range because its proposal did not satisfy the minimum requirements of the Solicitation, in that the proposal did not specify how the Commission, separate and apart from subcontractors, would satisfy Solicitation requirements. In Count X, Southfork alleged that the Commission's proposal was defective because the blind individual who would serve as cafeteria manager if the Commission's proposal were accepted, did not meet the experience requirements spelled out in the Solicitation for the position. Finally, in Count XI, Southfork alleged that the Air Force and the Commission had entered into direct negotiations for the purpose of achieving a contract award to the Commission when such negotiations were not authorized by either statute or regulation. Southfork also alleged that, in the course of these negotiations, the Commission was given access to confidential source selection information, which gave it an unfair competitive advantage in the evaluation process. In Count XII and in its prayer for relief, Southfork asked that the court declare that the Commission was not entitled to any preference under the RSA, that the court disqualify the Commission as an offeror, and that the court bar the Commission from award of the contract.

In due course, Southfork moved for partial summary judgment, while the United States and the State of Texas, which had intervened in the case, moved to dismiss Counts I through V for lack of jurisdiction and cross-moved for summary judgment on Counts VI through XII. The Court of Federal Claims responded in its August 29, 1996 decision by granting the motions for dismissal and summary judgment that had been filed on behalf of the defendant and the intervenor, and by denying Southfork's motion for partial summary judgment and its request for declaratory and injunctive relief.

The Court of Federal Claims determined that Southfork's contentions in Counts I–III concerned the validity of the regulations that authorize an SLA to respond to solicitations such as the one at issue. Citing 28 U.S.C. § 1491(a)(3), the court stated that its limited injunctive authority in bid protests rested upon an implied promise, by the government, to consider all bids fairly and honestly. Since Southfork's allegations in Counts I–III did not implicate that promise, the court dismissed the counts for failure to state a claim upon which relief could be granted. On similar grounds, the court dismissed Count IV, in which Southfork alleged that the Lackland dining facilities were misclassified as "cafeterias," as defined by RSA regulations. Noting Southfork's contention in Count V that any contract between the Commission and the Air Force would be illusory because the Commission enjoyed immunity from suit, the court determined that there was no evidence that this immunity "yielded a pricing advantage that other bidders did not enjoy." The court therefore dismissed the claim for lack of merit.

As far as Counts VI through XII were concerned, the court determined that the Air Force had not deviated from the evaluation process prescribed in the Solicitation and that Southfork had failed to show that the Commission's proposal was not properly within the competitive range. After the court's dismissal of Southfork's complaint, the government awarded the contract to the Commission.

## DISCUSSION

### I.

■ We review "in a plenary fashion whether the Court of Federal Claims properly granted summary judgment and whether the Court of Federal Claims properly dismissed for failure to state a claim upon which relief can be granted, as both are questions of law." *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1201 (Fed.Cir.1994) (citing *Dehne v. United States*, 970 F.2d 890, 892 (Fed.Cir.1992)). Summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." RCFC 56(c). A court may dismiss for failure to state a claim upon which relief may be granted only when it is beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *See Ponder v. United States*, 117 F.3d 549, 552 (Fed.Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1040, 140 L.Ed.2d 106 (1998). In this case, the facts are not in dispute.

■ Southfork advances two main arguments on appeal. The first is that the Court of Federal Claims erred in dismissing Counts I–III of the amended complaint for failure to state a claim upon which relief could be granted and in granting the government's motion for summary judgment with respect to Count VII. Southfork asserts that the Commission was not entitled to a preference in contract award under the RSA. Additionally, it contends that, to the extent that the implementing regulations of the Department of Education and DOD could be interpreted as allowing the Commission to receive a preference, they are beyond the authority granted under the RSA.[3] Southfork's second argument is that the court erred in granting the government's motion for summary judgment on Counts VI, VIII, IX, and X of the amended complaint. Southfork asserts that the Commission's proposal should have been

---

**3.** Southfork's argument on appeal with respect to interpreting the regulations represents a change of position. A review of Southfork's amended complaint, its motion for partial summary judgment, its response to the government's motion to dismiss, the transcript of oral argument on the parties' dispositive motions, and the decision of the Court of Federal Claims reveals that in the trial court, Southfork argued without qualification that the Department of Education and DOD regulations were invalid as beyond the authority granted by the RSA. Since we do not view the actions of the Air Force in this case as being contrary to the requirements of either its or the Department of Education's RSA regulations, we will treat Southfork's contentions on appeal as no different from the arguments it raised in the Court of Federal Claims. In any event, we generally do not consider arguments that are raised for the first time on appeal. *See Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426, 44 USPQ2d 1103, 1108 (Fed.Cir. 1997).

excluded from the competitive range because it failed to satisfy criteria in the Solicitation that were directed to compliance with the RSA. It also argues that, in including the Commission's proposal within the competitive range, the Air Force misapplied evaluation criteria in the Solicitation.[4] We address these contentions in turn.

## II.

■ The Court of Federal Claims is a court of limited jurisdiction. Under the Tucker Act, the court has jurisdiction "to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). We have stated that "[t]his jurisdictional grant extends to suits brought by disappointed bidders, commonly called bid protests, challenging the proposed award of contracts based on alleged improprieties in the procurement process." *Central Ark. Maintenance, Inc. v. United States*, 68 F.3d 1338, 1341 (Fed.Cir.1995). The jurisdictional basis for such suits is the alleged breach of "an implied contract to have the involved bids fairly and honestly considered." *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed.Cir.1983) (in banc). The government is said to breach the implied contract "if its consideration of offers is found to be 'arbitrary and capricious toward the bidder-claimant.' " *Central Ark.*, 68 F.3d at 1341 (quoting *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1203 (1974)).

■ If a breach of the implied contract to consider bids fairly and honestly is found, the Court of Federal Claims has the power to award equitable relief. The Tucker Act, as amended by the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 133(a), 96 Stat. 25, 40, provides in pertinent part as follows: "To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief." 28 U.S.C. § 1491(a)(3) (1994).[5]

■ The ultimate standard for determining whether an unsuccessful bidder is entitled to relief on the ground that the government breached the implied-in-fact contract to consider all bids fairly and honestly is whether the government's conduct was arbitrary and capricious. *See Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1203 (1974). In *Keco*, the Court of Claims set out four factors that are generally relevant to the determination of whether the government has breached its duty. Those factors are: (1) subjective bad faith on the part of the government; (2) absence of a reasonable basis for the administrative decision; (3) the amount of discretion afforded to the procurement officials by applicable statutes and regulation; and (4) proven violations of pertinent statutes or regulations. *See id.* at 1203–04.

As noted, in dismissing Counts I–III of the amended complaint, the Court of Federal

4. Southfork does not challenge the court's rulings with respect to Counts IV, V, and XI of the amended complaint.

5. In 1996, Congress repealed subsection (a)(3) of the statute and added a new subsection (b). *See* Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, § 12(a)(2), 110 Stat. 3870, 3874. New subsection (b)(1) provides:

Both the Unite[d] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded. 28 U.S.C.A. § 1491(b)(1) (Supp.1997). Section 12(b) of Pub.L. No. 104–320, 110 Stat. at 3875, provided that the amendments made by the 1996 act "shall take effect on December 31, 1996, and shall apply to all actions filed on or after that date." Southfork's original complaint was filed on January 31, 1996, and was amended on August 15, 1996. Accordingly, resolution of this appeal is governed by the law as it stood prior to the 1996 amendments. In the interest of convenience, when addressing that law, we speak in the present tense.

Claims held that Southfork had failed to state a claim upon which relief could be granted.[6] The court concluded that Southfork had failed to state a breach of the implied contract to fairly and honestly consider all bids that were received in response to the Solicitation. "Matters which do not bear on the legal correctness and fairness of the award process," the court stated, "do not present issues addressable under the implied contract of fair dealing that arises upon the submission of a bid." The court reasoned that neither the challenge in Count I to the determination that the Commission qualified as a blind person under the RSA nor the attacks in Counts II and III on the regulations implementing the RSA fit within this framework. Thus, the court observed with respect to the Department of Education regulations:

> If these regulations extend the statute beyond the manifest intention of Congress, as plaintiff contends, then plaintiff's recourse lies in a suit against the Secretary, for it is the Secretary's regulations that are the source of plaintiff's injury, not the actions of the contracting agency. In testing the Government's compliance with its implied promise of fair dealing, the only question that may be asked is whether a particular regulation has been correctly applied; not whether the regulation is itself correct.

Southfork argues that the court's decision with respect to Counts I–III and VII[7] is contrary to the decision of the United States Claims Court, now the Court of Federal Claims, in *McMaster Construction, Inc. v. United States*, 23 Cl.Ct. 679 (1991). In that case, McMaster submitted a bid for a government construction project and was in fact the

low bidder. The bid was rejected as nonresponsive, however, because McMaster failed to furnish with its bid a Certificate of Procurement Integrity, as required by the solicitation. The solicitation warned that failure to sign the certificate would render the bid nonresponsive. This warning was based upon 48 C.F.R. § 3.104–9(b)(3)(i)(C) (1990), which stated in regard to the Certificate of Procurement Integrity that "[f]ailure of a bidder to submit a signed certificate with its bid renders the bid nonresponsive." McMaster sued to enjoin the award of the contract to the next low bidder. *See McMaster*, 23 Cl.Ct. at 679. The sole ground for the protest was a challenge to the validity of the certification regulation. The government argued that determination of whether the regulation was invalid was not properly before the court in an injunctive action. The court rejected this argument. It held that McMaster could challenge the validity of the regulation upon the theory that there had been a breach of the implied contract of fair dealing, even though the contracting officer had uniformly applied the allegedly invalid regulation to all bidders. *See id.* at 683–84. The court based its holding on the fact that McMaster was contending that the certification regulation was contrary to 41 U.S.C. § 423(e), the statute that the regulation purported to implement.[8] According to McMaster, the statute did not speak to whether the certification required by § 423(e) had to be submitted at the time of bidding. In holding that it had jurisdiction to consider McMaster's claim, the Claims Court noted that there was "ample precedent for the position that violations of law or regulation are a ground for setting aside a procurement." *Id.* at 683.[9] For the reasons that follow, we

---

6. As did the Court of Federal Claims, we view Counts I–III of the amended complaint as challenges to the validity of the Department of Education and DOD regulations implementing the RSA.

7. The Court of Federal Claims rejected Southfork's claim in Count VII, similar to its claim in Count I, that the Air Force should have rejected the Commission's proposal because it did not satisfy the requirements of the RSA, in that it would not provide remunerative employment to blind persons.

8. Section 423(e) provided that a contractor had to submit a written certification stating that the contractor had no information concerning a violation or possible violation of certain contract procurement statutes or regulations. *See* 41 U.S.C. § 423(e)(1) (1994), *repealed by* National Defense Authorization Act for Fiscal Year 1996, Pub.L. No. 104–106, § 4304(a), 110 Stat. 186, 659.

9. In *McMaster*, the court rejected cases holding that the Claims Court could not review the validity of regulations in the context of a bid protest. *See, e.g., Stellacom, Inc. v. United States*, 24 Cl.Ct. 213, 215 (1991) ("The implied-in-fact contractual

reject Southfork's argument and decline to follow the reasoning of *McMaster.*

In *McMaster,* the Claims Court grounded its jurisdictional analysis in our decision in *CACI, Inc.-Federal v. United States,* 719 F.2d 1567 (Fed.Cir.1983). In that case, an unsuccessful bidder sued to enjoin the award of a contract based upon the allegation that the award selection process had been tainted by a conflict of interest, in violation of provisions of the Ethics in Government Act. *See* 18 U.S.C. §§ 207–208 (Supp.v.1981). In *CACI,* we reviewed the basis for the Claims Court's bid protest jurisdiction. We pointed out that, in adopting 28 U.S.C. § 1491(a)(3), Congress expected that the Claims Court would apply the same analysis that had been utilized by the District of Columbia Circuit in *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970). We stated:

> The essence of "the Scanwell doctrine," which Congress intended 28 U.S.C. § 1491(a)(3) to make applicable to the Claims Court, is that an unsuccessful bidder has standing to challenge a proposed contract award on the ground that in awarding the contract the government violated statutory and procedural requirements. That is precisely the basis upon which CACI here challenges the proposed award.... To deny CACI standing to litigate this question before the Claims Court would vitiate the jurisdiction Congress gave that court over such suits in the Federal Courts Improvement Act.

*CACI,* 719 F.2d at 1574. We therefore held that the unsuccessful bidder had standing to challenge the proposed contract award. *See id.* at 1575. Significantly, the allegation in *CACI* was that conflicts of interest on the part of the government officials who had conducted the procurement at issue had infected the bid evaluation process. In other words, CACI squarely asserted that the violation of a statute, the Ethics in Government Act, had resulted in CACI's bid not being fairly considered.

■ We never have said, however, that violation of a statute or regulation constitutes a per se breach of the government's duty to treat all bidders fairly and honestly. Rather, the rule is that a "proven violation of pertinent statutes or regulations can, but need not necessarily, be a ground for recovery." *Keco,* 492 F.2d at 1204. In *Central Arkansas,* we stated:

> Of particular relevance in determining whether the government has breached its implied contract, thus warranting the court's exercise of its injunctive power, is whether the government has violated any statute or regulation during the procurement process. However, not all violations of statute and regulation are the same; only a "clear and prejudicial" violation of a procurement statute or regulation warrants relief. Therefore, only violations that amount to a breach of the government's implied contract to consider an offer fairly and honestly will support the court's exercise of its injunctive powers.

68 F.3d at 1342 (citations and footnotes omitted).

■ We agree with the Court of Federal Claims that, in Counts I–III of its amended complaint, Southfork failed to state a claim upon which relief could be granted. In each of those counts, Southfork did invoke the court's jurisdiction by asserting that there had been "a breach of the Air Force's duty to fairly and honestly consider all offers." However, it did not follow that assertion with an allegation that the Air Force had acted in bad faith or that it had failed to comply with the pertinent procurement regulations. Rather, as was the case in *McMaster,* Southfork contended that by complying with those regulations, the Air Force had violated statutory requirements because the regulations themselves were fatally inconsistent with the statute they purported to implement, the RSA. Yet, this is precisely the kind of allegation that does not implicate the implied-in-fact contract of good faith and fair dealing. The reason is that neither bad faith nor

right does not provide a jurisdictional basis for a bidder to challenge the underlying regulations because those regulations came 'into existence before the implied contract and, in fact, form[ed] the basis of that contract.'" (quoting *Ingersoll–Rand Co. v. United States,* 2 Cl.Ct. 373, 376 (1983))).

unfair dealing arises when an agency does nothing more than follow previously promulgated regulations in conducting a procurement. Put another way, Southfork did not allege that the Air Force had failed to follow the regulations that were promulgated by the Department of Education and DOD to implement the RSA. And that is the nub of the implied-in-fact contract of good faith and fair dealing. The government promises to comply with duly promulgated regulations in conducting a procurement. The regulations pre-exist the implied-in-fact contract and therefore constitute part of the agreement. That the regulations under which the government conducts a procurement may be an invalid implementation of a governing statute does not mean that the government has breached its duty to be fair and honest to a particular bidder.

■ As far as Counts I–III are concerned, Southfork's real complaint was that the Department of Education and DOD had acted arbitrarily in promulgating the regulations that the Air Force followed in conducting the Lackland procurement. If a bidder wishes to challenge the validity of a regulation governing a procurement, the proper method of doing so is to bring an action in federal district court under the Administrative Procedure Act, 5 U.S.C. § 702. *See, e.g., Scheduled Airlines Traffic Offices, Inc. v. Department of Defense,* 87 F.3d 1356 (D.C.Cir.1996); *GBA Assocs. v. General Servs. Admin.,* 32 F.3d 898 (4th Cir.1994); *Dynalantic Corp. v. Department of Defense,* 937 F.Supp. 1 (D.D.C.1996), *appeal dismissed as moot,* 1996 WL 680226 (D.C.Cir. Oct. 7, 1996). Southfork failed to do that. We see no error in the trial court's decision with respect to Counts I–III and VII.

### III.

Southfork also argues that the Court of Federal Claims erred in granting summary judgment in favor of the government on Counts VI, VIII, IX, and X of the amended complaint. As noted, in those counts, Southfork asserted that the Air Force had misapplied applicable evaluation criteria when it included the Commission's proposal within the competitive range. Thus, in Count VI, it was alleged that the Air Force had deviated from the requirements of the Solicitation by ignoring the Commission's lack of experience and instead considering that of the subcontractor who would assist the blind individual who would be managing the Lackland cafeteria complex. In Count VIII, Southfork charged that the Air Force had failed to apply the Solicitation's evaluation criteria in a uniform and consistent manner because it did not penalize the Commission's proposal for the same deficiencies that resulted in unsatisfactory ratings for other proposals. In Count IX, Southfork charged that the Commission's proposal was defective because it did not specify how the Commission, as distinct from the subcontractor, would satisfy the minimum requirements of the Solicitation. Finally, in Count X, Southfork alleged that the Air Force should have excluded the Commission's proposal from the competitive range because it did not satisfy responsibility criteria in the solicitation. Specifically, Southfork charged that the Commission's proposal was defective because the blind person who would serve as the cafeteria manager, if the Commission's proposal were accepted, did not meet the experience requirements for that position as spelled out in the Solicitation.

As far as Count VI was concerned, the Court of Federal Claims stated that it could "see no defect in the Commission's proposal or in the manner in which it was evaluated by the Government." The court noted that, in the case of a proposal that contemplated the use of a subcontractor, as the Commission's proposal did, the Solicitation instructed that "the same information must be supplied regarding [the subcontractor's] capability and experience as would be supplied if the subcontractor were the prime doing the work." Addressing Count VIII, the court pointed out that, unlike the Commission's proposal, the proposal of another offeror was rejected because it failed to achieve acceptable ratings in thirteen of the eighteen technical factors comprising the competitive range assessment. The court observed that Count IX presented essentially the same contentions as were set forth in Counts VI and VIII. The court therefore rejected it. Fi-

nally, as far as Count X was concerned, the court noted that it was undisputed that the blind individual who would be serving as cafeteria manager under the Commission's proposal did not meet the stated requirements for the position. The court concluded, however, that Southfork was incorrect in arguing that the individual's failure to meet those requirements meant that the Commission's proposal was ineligible for inclusion within the competitive range. The court pointed out that the language of the Source Selection Evaluation Guide[10] contradicted Southfork's contention that failure to meet the minimum standards for a technical factor rendered a proposal unacceptable per se. Accordingly, the court granted summary judgment in favor of the government on Counts VI, VIII, IX, and X. We see no error in the court's decision.

### A.

As noted, the Solicitation provided that if the Commission submitted a proposal that was within the final competitive range, it would be awarded the contract, unless it was determined that such award would adversely affect the Air Force's interests or that the proposed blind vendor did not have the capacity to operate the cafeteria facility. As also noted, the Solicitation further provided that the competitive range would "consist of all proposals which are considered to have a reasonable chance of being selected for award." Air Force regulations spelled out the approach to be used in determining whether a proposal was within the competitive range:

> The competitive range must be determined after evaluation of all proposals received, on the basis of cost (price), technical, and other salient factors including proposal deficiencies and their potential for correction. Before including or excluding a proposal from within the competitive range, the possibility of its selec-

tion for award should be assessed. The objective is not to eliminate proposals from the competitive range, but to facilitate competition by conducting written and oral discussions with those offerors who have a reasonable chance of being selected for an award. When there is doubt as to whether a proposal is within the competitive range, the proposal should be included (see FAR 15.609).

Air Force Federal Acquisition Regulation Supplement (AFFARS), Appendix BB § 311(b) (1995). Federal Acquisition Regulation (FAR) 15.609 mirrors the Air Force regulation. *See* 48 C.F.R. § 15.609(a) (1996).[11]

We have stated that "[a] contracting officer has broad discretion in determining competitive range, and such decisions are not disturbed unless clearly unreasonable." *Birch & Davis Int'l, Inc. v. Christopher,* 4 F.3d 970, 973 (Fed.Cir.1993). In addition,

> [w]hen there is doubt as to whether a proposal belongs in the competitive range, FAR § 15.609 requires that it be included. "It is well established that a proposal must generally be considered to be within the competitive range unless it is so technically inferior or out of line as to price, as to render discussions meaningless."

*Id.* at 974 (quoting *M.W. Kellogg Co./Siciliana Appalti Costruzioni, S.p.A. v. United States,* 10 Cl.Ct. 17, 23 (1986)). We have no difficulty in concluding that the contracting officer did not abuse her discretion by including the Commission's proposal within the competitive range.

The Solicitation stated, in Section L–902, titled "METHOD OF PROPOSAL EVALUATION," that "[s]election of the Full Food Service contractor will be made on the basis of an integrated assessment by the Source Selection Authority ... of pertinent factors derived from the proposals received in response to the solicitation instructions." In

---

**10.** The Source Selection Evaluation Guide specifies the guidelines and procedures used for the evaluation of proposals.

**11.** On September 30, 1997, FAR Part 15 was amended. *See* 62 Fed.Reg. 51224 (1997). The new regulation concerning competitive range determinations states that the competitive range

shall be comprised "of all of the most highly rated proposals." 48 C.F.R. § 15.306(c) (1997). The amended rule, however, only applies to solicitations issued on or after October 10, 1997, and therefore does not apply to the solicitation before us. *See* 62 Fed.Reg. 51224.

SECTION M of PART IV of the Solicitation, titled "EVALUATION FACTORS FOR AWARD," it was stated that the source selection would be conducted according to AF-FARS Appendix BB and the FAR, and that award would "be based on an integrated assessment of each proposal and award made to the offeror whose proposal is judged to provide the best overall value to the government based [on the Solicitation's evaluation criteria]." Each proposal was evaluated through "general criteria, specific criteria, and assessment criteria." [12]

### B.

■ Turning to Counts VI and IX, Southfork contends that the Air Force failed to apply the Solicitation's evaluation criteria properly. In making this argument, it points to Section L–902 of the Solicitation, "METHOD OF PROPOSAL EVALUATION." Southfork notes, in particular, that when setting forth the technical evaluation factors to which offerors were required to respond (Management, Production, and Quality Control), the section referred repeatedly to the "offeror." From this reference, Southfork draws the conclusion that the Commission was required to demonstrate how either it as an entity, or the blind individual who would serve as the cafeteria manager, satisfied the technical evaluation factors. Starting from this premise, Southfork argues that the Commission's offer should not have been included in the competitive range because its responses with respect to the technical evaluation factors were solely in terms of the non-blind food service company that would be supporting the blind individual who would be managing the cafeteria. We disagree.

The Solicitation required each proposal to provide a convincing rationale to address how the offeror intended to meet the requirements as stated in the design specifications and the Request for Proposal (RFP). The Commission's proposal set forth the corporate skills and experience of those who were proposed to be involved in the performance of the contract. As the Court of Federal

Claims determined, "what an offeror's proposal was expected to demonstrate was the managerial capability necessary to the task at hand." Thus, there was no need for the Commission to detail its own corporate experience, since actual performance of the contract was to be subcontracted. In accordance with the instructions in the Solicitation regarding "Subcontract Information," the Commission's proposal properly supplied the same information "regarding its capability and experience as would be supplied if the subcontractor were the prime doing the work." The Court of Federal Claims did not err in granting summary judgment with respect to Counts VI and IX.

■ Nor do we see error in the Court of Federal Claims' grant of summary judgment in favor of the government with respect to Count VIII. The thrust of Southfork's allegation under that count was that the Air Force had abused its discretion by failing to uniformly and consistently apply the Solicitation's evaluation criteria. Southfork cites an evaluation of an unsuccessful offeror whose proposal was not found to be within the competitive range as the basis for the argument that the contracting officer unfairly favored the Commission. Southfork contends that every deficiency found in the management areas of the unsuccessful offeror's proposal also applied to the Commission's proposal. Yet, the unsuccessful offeror received unacceptable ratings in these categories, while the Commission received acceptable ratings. After reviewing the proposal submitted by the Commission, we decline to disturb the trial court's determination that the Commission's proposal provided the requested information and therefore was not deficient. Furthermore, as the trial court determined, the proposal of the other offeror was not rejected because of deficiencies in the technical area of corporate management, but rather because it was markedly inferior to that of the Commission. The rejected proposal failed to achieve an acceptable rating in thirteen of the eighteen technical fac-

---

12. The Solicitation's evaluation criteria are discussed in Part II of the BACKGROUND section of this opinion.

tors comprising the competitive range assessment.[13]

■ Finally, as noted, in Count X Southfork charged that the Air Force should have excluded the Commission's proposal from the competitive range because it did not satisfy responsibility criteria in the Solicitation relating to the RSA and because the blind individual who would serve as the manager of the Lackland cafeteria facility did not meet the Solicitation's qualification requirements.

Section M–901 of the Solicitation was titled "EVALUATION CRITERIA." As noted above, the section set forth the criteria that the Air Force would consider in evaluating proposals for award, and stated that three types of evaluation criteria would apply: general criteria, specific criteria, and assessment criteria. Paragraph d under the heading "General Criteria" was titled "Randolph–Sheppard Act Compliance." It provided as follows:

> A State Licensing Agency (SLA) requesting priority under the Act is subject to compliance review. In order to be eligible for award [the SLA] must show that economic opportunities to the blind are enlarged, and show that sighted employees or assistants are utilized only to the extent reasonably necessary.

Southfork argues that the Commission should have been excluded from the competitive range and should not have been granted a preference under the RSA because its proposal did not satisfy this general criterion. In making this argument, Southfork points to the fact that the Commission's proposal only contemplated the use of a blind person as cafeteria manager, with a non-blind corporate subcontractor providing training and support for the manager. Specifically, Southfork notes that the Air Force issued the Commission a deficiency report (DR) in which it was asked to show, as far as its proposal was concerned, "that economic opportunities to the blind are enlarged, and . . .

that sighted employees or assistants are used only to the extent reasonably necessary." Southfork asserts that there is no evidence that the Commission ever responded to this DR and that, accordingly, placing it within the competitive range and granting it a preference under the RSA were improper.

We reject Southfork's argument that the Commission's proposal should not have been included in the competitive range because the Commission failed to establish compliance with the RSA. As noted, the pertinent Air Force regulation provided that the objective of considering proposals was "not to eliminate proposals from the competitive range, but to facilitate competition by conducting written and oral discussions with those offerors who have a reasonable chance of being selected for an award." We fail to see how, when it issued the DR, the Air Force could have concluded that the Commission did not have "a reasonable chance of being selected for award." For the Air Force to have reached such a conclusion, it would have had to reject out of hand the proposition that economic opportunities for the blind could be enlarged by having a blind individual in the position of managing the entire Lackland cafeteria complex, even if no other blind individuals were employed. Such a choice, we believe, was well within the discretion of the Air Force's contracting officer. Accordingly, it could not be said that the Commission did not have "a reasonable chance of being selected for award" and that it was therefore barred from inclusion within the competitive range.

■ We also reject Southfork's argument that, because the blind individual who was proposed as cafeteria manager lacked the experience which the Solicitation prescribed for the "contract manager" position, the Commission's proposal should not have been included within the competitive range. Experience was one factor of several which were to be considered by the contracting officer in determining whether a proposal

---

**13.** The rejected proposal received unacceptable ratings in eight technical areas and marginal ratings in five areas. The proposal received an unacceptable rating in the following areas: (1) corporate structure, (2) functional description, (3) qualifications of management personnel, (4) labor requirements, (5) production management system, (6) organization, (7) manning, and (8) production plan. The proposal received a marginal rating in the following areas: (1) program surveillance, (2) business plan, (3) personnel, (4) pre-production planning, and (5) safety program.

belonged in the competitive range. The evaluation of the blind individual's experience came under "Factor 3" of the Solicitation, titled "Qualifications of Management Personnel." Factor 3 was listed under the category of "Management," along with eight other factors which, according to the Solicitation, were deemed to be of equal importance. Finally, "Management" was a subgroup under "Technical Considerations," one of three considerations listed under the "Specific Criteria" in the evaluation criteria. The Court of Federal Claims stated:

> Thus, in terms of its relative order of importance, the factor in question is significant in the overall evaluation scheme. But, that is not equivalent to saying—as plaintiff does here—that the failure to meet the prescribed content of a listed factor is enough to render the entirety of a proposal unacceptable.

We agree. The contracting officer had broad discretion to consider the evaluation of each factor as part of a totality of the circumstances in order to determine whether a proposal belonged in the competitive range. Southfork has not shown that the contracting officer abused that discretion.

## CONCLUSION

For the foregoing reasons, the trial court's dismissal of Counts I–V and its grant of summary judgment with respect to Counts VI–XII is affirmed.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*