ASIA PACIFIC AIRLINES, Plaintiff,

v.

UNITED STATES, Defendant,

Corporate Air, Alpine Air, and Aloha Airlines, Inc., Intervening–Defendants.

No. 05–711C.

United States Court of Federal Claims.

Filed Under Seal: Oct. 5, 2005.

Reissued: Oct. 14, 2005.

Boeing's Br. filed Oct. 19, 2005, at 15 n. 9.

Louis J. D'Agostino, Greenberg Traurig LLP, McLean, VA, for plaintiff. Of counsel were Joanne Young, David Kirstein, Richard Moorhouse, and David Hickey, Greenberg Traurig LLP, McLean, VA.

Steven M. Mager, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Bryant G. Snee, Assistant Director, Commercial Litigation Branch, Washington, D.C. Of counsel was Christopher Burton, United States Postal Service, Washington, D.C.

Robert K. Huffman, Miller & Chevalier Chartered, Washington, D.C., for intervenor-defendants Corporate Air and Alpine Air. Of counsel were Lisanne E.S. Cottington and Leah E.W. Frazier, Miller & Chevalier Chartered, Washington, D.C.

Scott T. Kragie, Squire, Sanders & Dempsey LLP, Washington, D.C., for intervenor-defendant Aloha Airlines, Inc. Of counsel were Marshall S. Sinick and Karen R. Harbaugh, Squire, Sanders & Dempsey LLP, Washington, D.C.

## OPINION AND ORDER [1]

LETTOW, Judge.

Asia Pacific Airlines ("Asia Pacific"), filed this pre-award bid protest to challenge action by the U.S. Postal Service ("USPS" or "Postal Service") to disqualify Asia Pacific's offer to provide air transportation services for delivery of inter-island Hawaiian mail. Asia Pacific and other air cargo carriers, including the three intervening defendants,[2] had responded to a solicitation with offers of services covering one or more of six different inter-island air "lanes." Upon the filing of this bid protest, the Postal Service agreed to suspend temporarily its award of any contracts for any of the lanes pending resolution of the protest.[3] Before the court are plaintiff's motion for judgment upon the administrative record, the government's motion to dismiss for lack of jurisdiction, and the government's and intervening-defendants' cross-motions for judgment upon the administrative record. In addition, a trial was conducted on September 8 and 9, 2005, concerning equitable issues.

1. Because this decision in its original form contained "confidential or proprietary information" within the meaning of the Rules of the Court of Federal Claims ("RCFC") Appendix C, ¶ 4, it was issued under seal. The parties filed proposed redactions on October 12, 2005, *see infra*, at 28, and the resulting redactions by the court are represented by brackets enclosing asterisks "[* * * *]".

2. The court granted motions by three other interested air-cargo carriers to intervene in this proceeding as defendants: Alpine Aviation, Inc., also known as Alpine Air Express or Alpine Air ("Al-

pine"), Corporate Air ("Corporate Air"), and Aloha Airlines, Inc. ("Aloha Airlines").

3. The court held a hearing on July 1, 2005, the same day the complaint was filed, on Asia Pacific's application for a temporary restraining order but did not thereafter act on that application, relying on a representation by the Postal Service that " 'the USPS can and will delay the award of any contracts placed at issue in the above-captioned bid protest pending a final decision on the merits.' " Opinion and Order of July 8, 2005 at 1 (quoting Def.'s Status Report (July 5, 2005) and appended Declaration of Leslie A. Griffith ¶ 5 (July 5, 2005)).

For the reasons set forth below, the court finds that there were errors in the Postal Service's solicitation that materially prejudiced Asia Pacific. Applying 28 U.S.C. § 1491(b)(2), the court orders an injunction requiring the Postal Service to re-solicit bids for the lanes involved in this solicitation, except that the court grants leave to the Postal Service to exercise its discretion, if it so desires, to grant contracts for the two smaller lanes (by projected annual volume) based upon the solicitation at issue. These lanes are Honolulu (HNL)—Kamuela (MUE) and Honolulu (HNL)—Lanai (LNY)—Hoolehua (MKK)—Kalaupapa (LUP).[4]

## BACKGROUND

### The Postal Service's Solicitation of Offers

After the terrorist attacks of September 2001, with very limited exceptions, the Postal Service has undertaken to ship mail by air via cargo planes rather than to use passenger planes for that purpose. The Postal Service contracts with private carriers for the air transportation ("line-haul") of such mail. In the Hawaiian islands, prior to the solicitation at issue in this case, Alpine provided the air line-haul services between the following service points: Honolulu (HNL), Lanai (LNY), Lihue (LIH), Kailua–Kona (KOA), Kalaupapa (LUP), Kahului (OGG), Hoolehua (MKK), Kamuela (MUE), and Hilo (ITO). AR 3, 654–57.[5] Alpine requested to have the air transportation contract terminated for convenience, creating the need for the solicitation at issue. AR 3. Under a supplemental agreement, Alpine is continuing its services through October 7, 2005. Tr. 436:22 to 437:13 (Test. of Eugene Mallette, President of Alpine);[6] 170:22–25 (Test. of Leslie Griffith, manager of the Air Transportation Category

Service Center, USPS); AR 1372–73 (Modification of Contract No. AMOT–2004–11_ALPINE_HI (July 26, 2005)).[7]

The Postal Service issued Solicitation No. 5AAIMT–05–A–3002 (the "Solicitation") on April 26, 2005, seeking proposals for air transportation services for the six air transportation "lanes" which connect Hawaiian service points as follows: HNL–OGG, HNL–LIH, HNL–ITO, HNL–KOA, HNL–MUE, and HNL–LNY–MKK–LUP. AR 30–31, 36. The Solicitation contemplated that contracts would be awarded on or about May 25, 2005, with performance under the contract to run for the period of June 25, 2005 to June 27, 2008. AR 32. The Solicitation was issued in accord with the U.S. Postal Service's Purchasing Manual, AR 32,[8] and the Postal Service indicated that its final determination would be made on a "best value" basis. AR 61 (Solicitation § 2.2.7 (last paragraph)). The mechanism used by the Postal Service to select an entity or entities to be awarded contracts was complex, involving first a series of qualifying technical determinations and then an electronic on-line bidding event to determine price and the pertinent awardee.

The Solicitation indicated that contracts would be awarded on a lane-by-lane basis. AR 36. Accordingly, prospective offerors were invited to bid on one or more of the six lanes. AR 58. An offeror could be awarded a contract for more than one lane. AR 60. The contract to be awarded for a given lane was to specify that the selected supplier would transport mail on that lane at a fixed rate per pound, with an indefinite annual quantity. AR 36. An estimated annual weight per lane was provided (derived from historical data), along with projected average daily and maximum daily weights. AR 90–91. The contracts awarded were to be for

---

4. The three-letter codes in parentheses correspond to airport codes as set forth in the Postal Service's solicitation at issue in this case.

5. "AR" refers to the Administrative Record provided to the court.

6. Alpine submitted [* * * *], AR 424–55 [* * * *] (May 20, 2005), [* * * *]. AR 362–390 [* * * *] (May 18, 2005); Tr. 432:16 to 433:1 (Test. of Mallette).

7. Mr. Mallette stated at trial that Alpine would be inclined to further extend this contract on a temporary basis for a higher rate if asked to do so by the Postal Service, Tr. 440:5–24 (Test. of Mallette), although [* * * *]. Tr. 434:7 to 435:1 (Test. of Mallette).

8. *See* The Postal Service Purchasing Manual, Issue 3, Dec. 25, 2003, *available at http:// www.usps.com/cpim/ftp/manuals/pm3/html/ welcome.htm* (last modified Oct. 1, 2004).

air transportation only and were not to include ground handling or terminal handling. AR 36–37. Ground handling of mail currently is being provided by Alpine, but the Postal Service intends to cover future ground handling services by a separate contract which has yet to be competitively bid. AR 43 (Solicitation § 1.11); AR 147 (Pre–Proposal Conference).

The Solicitation provided that the following factors would be used in the evaluation of offers, in order of preference:

(1) Performance Evaluation Factors

    1. Proposal Specific Factors

        a. Eligibility Determination (Pass/Fail)

        b. Proposed Schedule

    2. Supplier Specific Factors:

        a. Offeror's Past Performance

        b. Offeror's Capability (Pass/Fail)

(2) Price:

After the Postal Service determines that the offeror is eligible, and that its proposed schedule, past performance, and capability are acceptable, final pricing as determined by the Competitive Bidding Event will be the determining factor leading to the award of one or more contracts.

AR 57 (Solicitation § 2.2.2).

Under the Solicitation, the competitive purchasing process consisted of five steps, although the Solicitation warned that the following steps do not "fully represent the complete details of the evaluation process." AR 55 (Solicitation § 2.2). First, offerors were to submit the information required by the Solicitation, which included the offeror's lift capacity, a copy of the offeror's "Air Carrier Certificate" as provided by the Department of Transportation, a proposed schedule, a contingency plan, past performance information, capability information, and an initial pricing submission. AR 54, 56–57.

Second, an "Evaluation Team" was to make an initial determination of an offeror's eligibility to be awarded a contract. AR 55–56. This eligibility determination was mentioned in the "Performance Evaluation Factors," *see* Solicitation § 2.2.2 quoted *supra*, and consisted of a determination that the

offeror had a valid air carrier certificate. AR 58, 170–71. Although the Solicitation also included the "proposed schedule" as a specific performance-evaluation factor, it was not apparent that the proposed schedule was a pass-fail item equivalent to having a valid air carrier certificate. In that regard, the Solicitation included a "desired schedule and capacities" section ("Attachment A" of the Solicitation) that set out for each lane estimated timetables for the Postal Service to tender mail to and accept delivery of mail from ground handlers, estimated durations for ground handlers to load and unload planes at each location, estimated average daily mail volume, and maximum required lift capacities. AR 58, 136–37 (Revised "Attachment A Hawaii Pacific Schedule"). Section 2.2.4 of the Solicitation addressed the manner in which bidders' proposed schedules would be evaluated against the timetables provided in Attachment A:

> Schedule proposals will be evaluated on a lane-by-lane basis. An offeror may offer on one or more lanes as desired. *Schedule proposals that best match the flight schedule, frequency, and capacity [of] the Postal Service's desired schedule and capacities set forth in Attachment A . . . will be rated higher than those that match less successfully.* Proposals will be downgraded if they do not meet the tender and delivery time windows . . . . *Proposals that offer multiple flights to accommodate the necessary capacity* may be accepted, but they *will be of lesser value to the Postal Service than those that can transport the necessary volume with fewer flights,* since the Postal Service may incur a greater expense to handle multiple arrivals and departures.

AR 58 (emphasis added). By these criteria, the Postal Service focused on two elements: meeting the "desired" tender and delivery schedule, and minimizing the number of times USPS's ground handlers would be required to deal with arrivals and departures.

Third, for each offeror, the Postal Service was to conduct an initial evaluation of technical factors, the initially tendered price, and the offeror's overall capability. This initial evaluation could "result in discussions with

individual offerors regarding any aspect of a proposal." AR 56 (Solicitation § 2.2 ¶ 3).

Fourth, after the initial evaluation, offerors could be eliminated or they could "be slated for a more detailed analysis to include the invitation to participate in a Competitive Bid Event," a web-based auction process to be conducted by an entity styled CombineNet, Inc. ("CombineNet"). AR 56 (Solicitation § 2.2 ¶ 4). The CombineNet software used to run the Competitive Bid Event was to allow the bidders to modify their prices in real time, and enable bidders to determine whether they were the "leading" bidder at any given time. AR 59. The software also permitted the bidding parties to offer volume discounts by linking bids for one lane to that for another lane or those for other lanes. *Id.* During a pre-proposal bidders' conference held on May 2, 2005, a representative of the Postal Service explained to prospective offerors that an offeror could bid on two lanes and state that if it received more than a certain dollar amount of business on the combined routes, the offeror would provide a certain percentage discount. AR 211–20 (Transcript of Pre–Proposal Conference). The price per lane as established through the Competitive Bidding Event was critical to the procurement; as the Evaluation portion of the Solicitation stated "[a]fter the Postal Service determines that the offeror is eligible, and that its proposed schedule, past performance, and capability are acceptable, *final pricing* as determined by the Competitive Bidding Event *will be the determining factor* leading to the award of one or more contracts." AR 57 (Solicitation § 2.2.2) quoted *supra* (emphasis added).

Nonetheless, the fifth and final step set out in the Solicitation provided that after the Competitive Bidding Event, the Postal Service, "at its option, may again conduct discussions with one or more offerors having standing in the procurement." AR 56, Solicitation § 2.2 ¶ 5. At the pre-proposal bidders' conference on May 2, 2005, Mr. Griffith stated generally that "[a]fter the final CBE [Com-petitive Bidding Event], we'll award the contract." AR 168 (Pre–Proposal Conference).

## The Offerors' Proposals and the Postal Service's Consideration of the Proposals

Asia Pacific submitted a proposal in response to the Solicitation on May 18, 2005. AR 562 (Letter from Gary Waldman, Director of Planning, Asia Pacific, to Patricia Jordan, Contracting Officer, USPS (May 18, 2005)), 563 (Asia Pacific's Proposal (May 18, 2005)). In its submission, Asia Pacific proposed to provide line haul services on the HNL–OGG and HNL–ITO lanes, basing two large Boeing 727F aircraft in Honolulu for that purpose. AR 564, 578 (Attachment F of Asia Pacific's Proposal (May 18, 2005)). Asia Pacific provided its proposed schedule by completing a form appended as "Attachment F" to the Solicitation. AR 578 (Asia Pacific's proposed schedule). On the "Attachment F" form, the Postal Service had listed tender and delivery times for each lane, as well as the estimated average daily volume and maximum required daily volume of mail that an offeror would be required to carry for each lane. *Id.* Offerors were to fill in proposed departure and arrival times, as well as the type of aircraft and maximum weight capacity for those aircraft. On the HNL–OGG and HNL–ITO lanes, the Postal Service listed two morning tender and delivery times and two evening tender and delivery times every Monday through Saturday, with one tender and delivery time on each Sunday or holiday. AR 136. Asia Pacific proposed to carry the entire amount of mail on each route in once-daily weekday round-trips on each lane. AR 578–79. On Sundays and holidays, Asia Pacific offered one trip from HNL to OGG with a stop in ITO. *Id.* The 727F aircraft that Asia Pacific proposed to use were capable of carrying the maximum weight that USPS anticipated for both tender times combined on each route. *Id.;* AR 136. The pertinent aspects of Asia Pacific's proposed Monday–Saturday schedule on the form were as follows:

| Origin | Dest. | Tender Time (from ground handler) | Asia Pacific's Proposed Departure | Asia Pacific's Proposed Arrival | Delivery Time (to ground handler) | Avg. Vol. (1000 lbs.) | Max. Vol. (1000 lbs.) | Maximum Capacity of Asia Pacific's 727F (1000 lbs.) |
|---|---|---|---|---|---|---|---|---|
| HNL | OGG | 0115 | [****] | [****] | [****] | 20 | 28 | [****] |
| HNL | OGG | 0300 | [****] | [****] | [****] | 6.3 | 12 | [****] |
| OGG | HNL | 1500 | [****] | [****] | [****] | 6 | 7.8 | [****] |
| OGG | HNL | 1730 | [****] | [****] | [****] | 8.5 | 13 | [****] |
| HNL | ITO | 0130 | [****] | [****] | [****] | 11.47 | 15 | [****] |
| HNL | ITO | 0300 | [****] | [****] | [****] | 1.575 | 10 | [****] |
| ITO | HNL | 1530 | [****] | [****] | [****] | 4.6 | 8 | [****] |
| ITO | HNL | 1730 | [****] | [****] | [****] | 5.5 | 6 | [****] |

AR 578. Asia Pacific's proposal did not include bids for the other four lanes (HNL–LIH, HNL–KOA, HNL–MUE, and HNL–LNY–MKK–LUP). AR 578–79; Tr. 397:24 to 399:11 (Test. of Michael Quinn, President of Asia Pacific).

Intervening-defendant Aloha Airlines submitted a proposal that included bids on the HNL–OGG, HNL–ITO, and HNL–KOA lanes. AR 481–82 (Attachment F of Aloha Airlines' Proposal (May 17, 2005)); Tr. 314:4–16 (Test. of Michael Coffman, Vice President, Cargo & Contract Services, Aloha Airlines). Intervening-defendant [* * * *] Corporate Air [* * * *] submitted [* * * *]. AR 363 (Corporate Air's Proposal (April 26, 2005)); Tr. 432:16 to 433:17 (Test. of Mallette). The [* * * *] proposal included bids for [* * * *] lanes. AR 390 (Corporate Air's Proposal).

After Asia Pacific's submission of its proposal and prior to the Competitive Bidding Event, the Postal Service staff contacted Asia Pacific to discuss two aspects of its proposal. Tr. 345:10 to 346:9 (Test. of Quinn). In its original proposal, Asia Pacific had made its bid conditional on receiving a guaranteed volume of mail from the Postal Service, and also provided that it would apply an additional fuel surcharge and have the right to terminate the contract if fuel prices increased by more than 15%. AR 564 (Asia Pacific's Proposal). The Postal Service advised Asia Pacific that these two provisions would have to be removed from its proposal before Asia Pacific would be allowed to participate in the Competitive Bidding Event,

and Asia Pacific subsequently removed these provisions. Tr. 345:10 to 346:9 (Test. of Quinn). The Postal Service did not contact Asia Pacific prior to the Competitive Bidding Event regarding its proposed schedule, however. Tr. 350:7–17 (Test. of Quinn).

Asia Pacific was allowed to participate in the Competitive Bidding Event, which took place on May 27, 2005. Bids were to be made on a price-per-pound basis. Asia Pacific was the low bidder for two lanes when the on-line auction ostensibly closed that day. Tr. 347:2–7 (Test. of Quinn). Shortly thereafter, however, the Postal Service and CombineNet, its contractor running the Competitive Bidding Event, determined that one of the bidders in the auction, Aloha Airlines, had entered a bid on the HNL–KOA lane near the close of the auction that was not registered by the computer system that was handling the auction process. AR 334 (CombineNet Production Incident Report (May 27, 2005)). The new bid should have caused the computerized auction system to create a five-minute "overtime" period during which bidding for all lanes would remain open due to the possibility that a different bidder would enter a fresh bid linked to other lanes. Tr. 196:20 to 198:4 (Test. of Griffith). Because of this computer error, the Postal Service decided to re-open the auction on all lanes. At that point, Asia Pacific made a request to the Postal Service that bidding be re-opened only for the HNL–KOA lane. AR 305 (E-mail from Joanne Young and David Kirstein, counsel for Asia Pacific, to Michael Leicht-

man and Leslie Griffith, USPS (May 30, 2005)); AR 638 (Letter from Joanne Young and David Kirstein to Patricia Jordan (June 2, 2005)). The Postal Service refused, stating that all of the lanes in the auction were potentially linked due to bidders' ability to offer volume discounts across all lanes. AR 285–86 (E-mail from Leslie Griffith, USPS, to Michael Quinn, Asia Pacific (June 2, 2005)); AR 642 (Letter from Patricia Jordan, USPS, to Joanne Young and David Kirstein (June 2, 2005)).

An extended auction period took place on June 2, 2005. *See* AR 291 (E-mail from Patricia Jordan, USPS, notifying bidders of the extension (June 1, 2005)). At the end of the extension Asia Pacific emerged with the low bids on the HNL–OGG and HNL–ITO lanes, with final bids that were lower than the apparent winning bids it had made on May 27. AR 337; Tr. 347:2–25 (Test. of Quinn). Aloha emerged as the low bidder on the HNL–KOA lane. AR 337. Corporate Air [* * * *] emerged as the low bidder for the HNL–LIH, HNL–MUE, and HNL–LNY–MKK–LUP lanes. AR 257–58; *see also* Tr. 432:16 to 433:17 (Test. of Mallette).

After the auction process had been completed and Asia Pacific had seemingly won the Competitive Bidding Event for two lanes, the Postal Service interposed questions regarding Asia Pacific's proposed schedule that had not previously been raised. Specifically, the Postal Service took the position that Asia Pacific's proposed schedules did not conform to the schedules set forth in Attachment A of the Solicitation, which showed two round trips per day per lane. *See* AR 624 (E-mail from Patricia Jordan, USPS, to Gary Waldman and Michael Quinn, Asia Pacific (June 9, 2005)), AR 627 (E-mail from Leslie Griffith, USPS, to Gary Waldman, Asia Pacific (June 7, 2005)). In response to these inquiries, Asia Pacific contacted the Postal Service, indicating a willingness to negotiate with the Postal Service on scheduling issues, *see, e.g.,* AR 625 (E-mail from Gary Waldman, Asia Pacific, to Leslie Griffith and Patricia Jordan, USPS (June 8, 2005)); AR 624 (E-mail from Mi-

chael Quinn, Asia Pacific, to Patricia Jordan and Leslie Griffith, USPS (June 9, 2005)), and it proposed two alternative schedules to Postal Service officials between June 13 and June 17. *See* AR 607 (Letter from Patricia Jordan, USPS, to Michael Quinn, Asia Pacific (June 21, 2005)). Asia Pacific's officials also requested a meeting with the Postal Service employees to discuss any outstanding problems. AR 613 (E-mail from Michael Quinn, Asia Pacific, to Leslie Griffith and Patricia Jordan, USPS (June 17, 2005)); Tr. 365:25 to 366:7; 401:6–25 (Test. of Quinn). The Postal Service employees who were conducting the solicitation rejected Asia Pacific's revised schedules, stating that "[Asia Pacific's] proposed schedule for the HNL–OGG and the HNL–ITO lanes *was*, and remains, even after the modification, wholly *inconsistent with the requirements* of the Postal Service *as set forth in the solicitation.*" AR 607 (Letter from Patricia Jordan, USPS, to Michael Quinn, Asia Pacific (June 21, 2005))(emphasis added). Asia Pacific was notified that its proposal had been removed from consideration by Patricia Jordan of the Postal Service on June 21, 2005. *Id.*

Post–Solicitation Proceedings

In its complaint filed on July 1, 2005, Asia Pacific seeks a declaratory judgment that the elimination of Asia Pacific from the Postal Service's competitive procurement to provide air transportation services for delivery of intra-Hawaiian island mail was arbitrary and capricious, an abuse of discretion, and not in accordance with law or the terms of the Solicitation. Compl. at 10 (Prayer for Relief). Asia Pacific also requests that the court enjoin the Postal Service from awarding a contract for any of the lanes, unless the Postal Service awards contracts for the OGG–HNL and ITO–HNL lanes to Asia Pacific. *Id.* In accord with 28 U.S.C. § 1491(b)(3), the court adopted an agreed, expedited schedule for submitting the administrative record and for briefing cross-motions for judgment on the record.[9] The court also granted leave to Asia Pacific to depose the Postal Service's contracting officer, Patri-

9. 28 U.S.C. § 1491(b)(3) provides that "[i]n exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action."

cia Jordan, and her immediate supervisor, Leslie Griffith. Order of July 25, 2005 (relying on *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed.Cir.2001)). Those depositions were taken and became part of the record as AR 1126–1328. Because equitable relief was contested, a two-day trial of facts bearing on equitable issues was held on September 8 and 9, 2005. The case is now ready for disposition.

## ANALYSIS

Asia Pacific has asserted that the Solicitation and the resulting procurement process were internally contradictory and contrary to the Postal Service's Purchasing Manual. Asia Pacific alleges that the Solicitation did not adequately specify USPS's requirements, particularly insofar as the Solicitation indicated that the schedules provided by the Postal Service were desired, not mandatory. The government and intervening defendants respond by averring that the requirements of the Solicitation were unambiguous and that the Solicitation expressly specified that the schedules were mandatory. Asia Pacific counters that the reasonableness of its interpretation is borne out not only by the contents of the Solicitation itself, but also by the actions of the Postal Service's procurement staff during the solicitation process. For example, Asia Pacific alleges that the Postal Service's employees responsible for the Solicitation process did not clarify the ambiguity regarding the mandatory nature of the schedules and that the Postal Service in fact pre-qualified Asia Pacific to participate in the auction taking into account Asia Pacific's schedules. Asia Pacific further claims that the terms of the Solicitation, as well as the representations of officials of the Postal Service about scheduling, affirmatively encouraged prospective bidders to propose innovative solutions to carrying the mail that did not conform to the schedules shown in the Solicitation.

The government and intervenor-defendants also assert that even if Asia Pacific can show injury with respect to the two lanes on which it submitted proposals, Asia Pacific suffered no injury with respect to the four routes on which it did not submit proposals. Asia Pacific responds that it will be materially injured if it is not given the opportunity to make a proposal covering all of the lanes, because Asia Pacific's entire bidding strategy was based on misunderstandings that were engendered by a flawed Solicitation process. Asia Pacific asserts that any new proposal for the lanes on which it previously bid will be based on changed assumptions, and may require inclusion of bids on one or more of the smaller lanes to make the bid economically viable. Essentially, the plaintiff claims that because all of the lanes were linked for purposes of the Solicitation, they must now all be re-solicited.

This analysis first addresses this court's jurisdiction and Asia Pacific's standing with respect to all six lanes involved in the Solicitation. After addressing the standards for this court's decision in a pre-award bid protest case, the court addresses whether the procurement was flawed to the prejudice of Asia Pacific. A concluding section deals with equitable issues affecting relief.

### A. Jurisdiction and Standing

This is a pre-award bid protest. The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874–75 (Oct. 19, 1996), provides that the United States Court of Federal Claims "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract ... or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). This statute further provides that the Court of Federal Claims "shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded." *Id.* These provisions have been interpreted as providing this court with jurisdiction over both pre– and post-award bid protests. *See American Fed'n of Gov't Employees, AFL–CIO v. United States*, 258 F.3d 1294, 1300 (Fed.Cir.2001); *see also RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed.Cir.1999). This pre-

award bid protest case falls squarely within the ambit of Section 1491(b)(1), and the court has subject-matter jurisdiction to adjudicate Asia Pacific's claims in this case. *See Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1080–84 (Fed.Cir.2001) (upholding this court's jurisdiction over a bid protest involving the Postal Service and rejecting a claim that the Service is not a "federal agency" subject to 28 U.S.C. § 1491(b)(1)).

▮▮▮ To establish standing, a protester must establish that it is an "interested party" and that it has been prejudiced. *See Park Tower Mgmt., Ltd. v. United States,* 67 Fed. Cl. 548, 558 (2005) (quoting 28 U.S.C. § 1491(b)(1)). The Court of Appeals for the Federal Circuit has interpreted the term "interested party" to have the same meaning as that term is given in the Competition in Contracting Act, 31 U.S.C. § 3551. *Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1351–52 (Fed.Cir.2004).[10] In *Banknote,* the Federal Circuit held that the interested parties who may invoke this court's bid protest jurisdiction are " 'limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.' " *Id.* (quoting *American Fed'n of Gov't Employees,* 258 F.3d at 1302).

▮▮▮ Asia Pacific has represented that its economic interests will be affected adversely by the failure to win contracts to carry mail on the Hawaiian inter-island lanes. A loss of business is ordinarily adverse, at least if the business would be profitable or would at least cover fixed costs. In this instance, Mr. Quinn testified that Asia Pacific's business plan relied heavily upon winning one or more of these line-haul contracts as part of Asia Pacific's efforts to cover its fixed costs and enhance its profit-making potential. Tr. 345:13–15, 354:14 to 355:8 (Test. of Quinn). However, the government claims that Asia Pacific did not qualify as an interested party even regarding the two lanes on which it submitted proposals (HNL–OGG and HNL–

ITO) because it was incapable of receiving the award at issue. Def.'s Cross–Mot. ("Def.'s Mot.") at 16, 18–19 (citing *United States v. IBM Corp.,* 892 F.2d 1006, 1012 (Fed.Cir.1989)).

More specifically, the government contends that an offeror that fails to conform with an essential element of a solicitation is not in a position to receive award of the contract and that Asia Pacific's failure to conform to the schedules specified in Attachment A of the Solicitation amounted to nonconformity with an essential element of the Solicitation. Def.'s Mot. at 16. Defendant's contention relies on the premise that the schedules in Attachment A were an immutable and essential element of the Solicitation. This premise is flawed. The Solicitation and the pre-proposal statements of the Postal Service's officials were ambiguous and contradictory regarding whether the schedules were desired or mandatory. *See infra,* at 20–22. Additionally, the evidence indicates that Asia Pacific would have been able to perform had contracts for the two lanes on which it bid have been awarded to Asia Pacific. Mr. Quinn testified at trial that Asia Pacific was fully capable of performing the schedules it submitted in its proposals using its own aircraft, Tr. 346:10–12 (Test. of Quinn), and likely would have been able to secure additional aircraft from subcontractors to make additional flights required by USPS. Tr. 353:15–21, 375:19–25, 401:3 to 403:3 (Test. of Quinn). The court therefore finds that Asia Pacific is an "interested party" with respect to the two lanes on which it submitted a proposal.

With respect to the four lanes on which Asia Pacific did not submit a proposal, the government asserts that Asia Pacific has no standing to protest because Asia Pacific evidenced "a clear intent not to bid upon those lanes." Def.'s Mot. at 19–20. The government's postulate for this argument consists of an assumption that Asia Pacific would not have bid on these lanes had the Solicitation been unambiguous and a true reflection of

---

10. 31 U.S.C. § 3551(2)(A) states that "[t]he term 'interested party,' with respect to a contract or a solicitation or other request for offers ..., means an actual or prospective bidder or offeror whose

direct economic interest would be affected by the award of the contract or by failure to award the contract."

the Postal Service's requirements. This assumes too much. As will be shown, the Solicitation was ambiguous and internally contradictory, and Asia Pacific may have pursued an entirely different bidding strategy that included some of the other lanes had the Solicitation not been flawed. *See* Tr. 355:9 to 356:3 (Test. of Quinn). Additionally, the Postal Service's officials who managed the Solicitation represented that bids for all six lanes were inextricably linked. For example, when during the Competitive Bidding Event one of the bids on the HNL–KOA lane failed to trigger an "overtime" period, the Postal Service insisted on holding an extended auction for all six lanes (over the protests of Asia Pacific) because all of the lanes could be linked. *See supra*, at 15; *see also* AR 642 (Letter from Patricia Jordan, USPS, to Joanne Young and David Kirstein (June 2, 2005)). The court therefore finds that Asia Pacific is an "interested party" also as to the four lanes on which it did not submit a proposal.

To show standing, in addition to demonstrating that it is an "interested party," Asia Pacific must also establish that it has been "prejudiced" by the Postal Service's solicitation process. *See Park Tower Mgmt.*, 67 Fed.Cl. at 559. "Since 'the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.'" *Id.* (quoting *Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir.2003)). To show prejudice, a protestor must demonstrate more than "a mere possibility that the protester would have received the contract but for the error [in the procurement process]." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996). However, "a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Id.* Rather, the disappointed bidder must show that "had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Id.* The standard in *Data General* "reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensur-

ing that protesters who have been adversely affected by allegedly significant error during the procurement process have a forum available to vent their grievances." *Id.* at 1563. Because Asia Pacific was allowed to participate in the Competitive Bidding Event and then emerged as the low bidder on two of the lanes, Asia Pacific has demonstrated that but for the Postal Service's alleged errors in the procurement process, Asia Pacific had a substantial chance of receiving contracts. Therefore, Asia Pacific has established that it has been prejudiced.

Having established that it is an "interested party" and having shown that the Postal Service's alleged errors prejudiced it, Asia Pacific has established standing to protest the Postal Service's actions under the Solicitation at issue.

**B. The Administrative Record**

■ "As a practical matter … in most bid protests, the administrative record is something of a fiction, and certainly cannot be viewed as rigidly as if the agency had made an adjudicative decision on a formal record that is then certified for court review." *International Res. Recovery, Inc. v. United States*, 59 Fed.Cl. 537, 541 (2004). Nonetheless, the starting point for judicial action in a protested procurement should be the contemporaneous administrative record of the agency's action. *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed.Cir.2001). Gaps in the administrative record may exist largely because of the informal nature of the agency's action. When an explanation of a contracting officer's decision is required for meaningful judicial review, a reviewing court has the power, and sometimes the obligation, to require such an explanation. *Impresa Construzioni*, 238 F.3d at 1338. As a matter of general administrative law, the standard course for supplementing an inadequate record is to remand the agency action under review to the agency. *Id.* (citing *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990)). However, in bid protest cases, providing for a deposition of the contracting officer may prove far more

efficient. *Impresa Construzioni*, 238 F.3d at 1339. Such depositions may enable the court to satisfy its statutory duty to "give 'due regard' to 'the need for expeditious resolution of the action.'" *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed.Cir.2005) (quoting 28 U.S.C. § 1491(b)(3)). In addition, when there is a reasonable possibility that a contracting officer may have taken into account information beyond that in the administrative record, supplementation of the record is appropriate. *See J.C.N. Constr. Co. v. United States*, 60 Fed.Cl. 400, 404–05 n. 8 (2004) (citing *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989)), *aff'd*, 122 Fed.Appx. 514 (2005). In this instance Leslie Griffith and Patricia Jordan were the officials of the Postal Service who ultimately made the decision to terminate Asia Pacific's participation in the solicitation. *See* AR 607–609 (Letter from Patricia Jordan, USPS, to Michael Quinn, Asia Pacific (June 21, 2005); AR 251 (Deposition of Leslie Griffith (Aug. 1, 2005)). Their rationale for doing so was not apparent from the administrative record. Therefore, the court granted leave to plaintiffs to depose Mr. Griffith and Ms. Jordan, and allowed the supplementation of the record with the resulting deposition transcripts. Other non-contemporaneous materials have been added to the record. They include (1) a ten-page declaration of Christine Powell, a Transportation Specialist in Commercial Air Operations for the Postal Service, dated August 15, 2005, and submitted as an attachment to the government's motion to dismiss filed on that same date, (2) the final Purchase Plan for the Solicitation, AR 1365–71, dated July 18, 2005, after this case was filed by Asia Pacific, and (3) testimony given by Ms. Powell on September 8, 2005, at the trial on equitable issues, which testimony reiterated and elaborated upon the points made in her declaration dated August 15, 2005 about the Solicitation, particularly with respect to the Postal Service's intent regarding the schedule set out in the Solicitation. *See infra*, at 23–24 (describing the import of Ms. Powell's testimony respecting the schedule).

The court is well aware of the possibility that the officials' supplementary declarations, depositions, and testimony at trial may reflect wisdom gained by hindsight and may not represent the officials' actual bases for making decisions during the procurement. Notably, "[i]n examining this expanded record, this [c]ourt is mindful that it must critically examine any *post hoc* rationalization." *PGBA, LLC v. United States*, 60 Fed.Cl. 196, 204 (2004), *aff'd*, 389 F.3d 1219 (Fed.Cir. 2004); *see also Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 549, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Co–Steel Raritan, Inc. v. International Trade Comm'n*, 357 F.3d 1294, 1316 (Fed.Cir.2004).

### C. Standards for Decision

Under 28 U.S.C. § 1491(b)(4), this court's review of an agency's decision regarding a contractual solicitation or award takes place in accord with standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706.[11] Section 706 calls on a reviewing court to set aside agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This court should overturn a procurement decision only where "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni*, 238 F.3d at 1332. *See also Gentex Corp. v. United States*, 58 Fed.Cl. 634, 648 (2003). An agency's decision can be found to lack a rational basis where "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Keeton Corrs., Inc. v. United States*, 59 Fed.Cl. 753, 755 (2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State*

11. As previously noted, this Court's jurisdiction over this case rests on 28 U.S.C. § 1491(b)(1). By statute, "[i]n any action under this subsection [*i.e.*, § 1491(b)], the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(4).

*Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). In evaluating an agency's findings, "the court 'is not empowered to substitute its judgment for that of the agency.'" *Keeton Corrs.,* 59 Fed. Cl. at 755 (quoting *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814). Rather, the court "must look to see whether the agency considered the relevant factors and made a rational determination." *Keeton Corrs.,* 59 Fed.Cl. at 755 (citing *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir.2000)).

▮ To prevail in a bid protest, having first shown that the government acted without a rational basis or contrary to law in the procurement process, a disappointed offeror must also show that the government's error prejudiced the offeror's posture in the procurement process. *Bannum,* 404 F.3d at 1351. *See also Advanced Data Concepts,* 216 F.3d at 1057 (citing *Data General Corp.,* 78 F.3d at 1562). This requirement has also been described as follows: "for [plaintiff] to prevail it must establish not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error." *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996). The court first addresses the propriety of the Postal Service's actions in the procurement, then turns to the issue of prejudice to Asia Pacific.

### D. The Postal Service's Actions In The Procurement

#### 1. *Compliance with legal requirements.*

▮ The Postal Service has instituted a Purchasing Manual to guide its employees in their purchasing decisions. *See supra,* at 11 n. 8. Under the Manual, planning for a procurement is to be made by a purchase team, the members of which are to represent "the organization [within the Postal Service] requesting the purchase, the purchasing organization, and other organizations needed to help determine best value." Purchasing Manual § 2.1.3.a. A purchase team is to be headed by a contracting officer. *Id.* Section 4.2.2.a of the Manual requires that "[p]urchase teams must ensure that the solicitation

clearly states the needs of the Postal Service and clearly communicates how proposals will be evaluated." *Id.* § 4.2.2.a (emphasis added). The Solicitation at issue in this case set out divergent information regarding the scheduling requirements for prospective offerors. In the "Evaluation" section, § 2.2.4 (quoted in full, *supra* p. 12), the Solicitation stated that "[s]chedule proposals that best match the flight schedule, frequency, and capacity [of] the Postal Service's desired schedule and capacities set forth in Attachment A [of the Solicitation] ... will be rated higher than those that match less successfully. Proposals will be downgraded if they do not meet the tender and delivery time windows." AR 58. In the next sentence the Solicitation stated that "[p]roposals that offer multiple flights to accommodate the necessary capacity may be accepted, but they will be of lesser value to the Postal Service than those that can transport the necessary volume with fewer flights, since the Postal Service may incur a greater expense to handle multiple arrivals and departures." *Id.* Asia Pacific interpreted the Solicitation as inviting proposals that would carry all of the mail on a given lane in a single daily round-trip flight with a single large-capacity aircraft. *See* AR 564 (Asia Pacific's Proposal). Mr. Quinn testified that he understood that the previous supplier on the Hawaiian islands lanes was using smaller aircraft to carry the mail, which required the supplier to make more trips per day. Mr. Quinn stated that this increased number of trips could result in higher ground-servicing costs for the Postal Service in comparison with a single flight with a larger plane. Tr. 351:16 to 352:16. (Test. of Quinn).

The government challenges Asia Pacific's interpretation of the Solicitation as unreasonable, and suggests that Asia Pacific should have been guided by the "Statement of Work" section of the Solicitation instead of the "Evaluation" section. Def.'s Mot. at 29. The government specifically cites the subsection entitled "Schedule" (§ 1.6), which states that "[t]he line haul supplier must not arrive later nor depart earlier than the times as stated in the schedule under Attachment A unless specifically authorized by the con-

tracting officer." AR 42. However, that subsection also advises that "[t]he flight and tender/delivery schedules accepted by [the Postal Service] will become the contractual schedule of operations," *id.*, suggesting that the Postal Service has some flexibility regarding the schedule.

The bidders' conference held May 2, 2005, before bids were submitted, addressed scheduling issues. The transcript of this conference was provided to prospective bidders for information as an attachment to Amendment Number 4 to the Solicitation, which was released on May 16, 2005. *See* AR 134–238. The Postal Service's representative hosting the conference, Mr. Griffith, stated at one point during the conference that "[the Postal Service is] planning on awarding contracts based on offerors compliant with this schedule *or very close to it.*" AR 187 (emphasis added). Mr. Griffith also stated that a proposal that is "closest to my requirement" will "score higher" than other proposals. AR 169. Statements at the bidders' conference also suggested that an offeror that could handle the mail in fewer flights would be preferable because of the added expense to the Postal Service of handling multiple flights. For example, Mr. Griffith indicated that "if you can do that shot of mail for that trip in fewer trips, that will be considered of more value to the postal service in its evaluation than if it takes you five trips to do it because I've only got to hire the ground handler guy enough to handle the one trip or two trips versus having him present and handling five trips which will cost more money." AR 195. Christine Powell, a Postal Service employee who also attended the conference, indicated that the Postal Service may be willing to work with offerors offering single flights: "I understand that there may be . . . a carrier that can take all of the mail

at one time. We have to have that worked out also as far as times into the discussion." AR 187–88.

The government and intervenors insist that these ambiguities regarding schedule requirements can be rationally interpreted only as allowing offerors to propose multiple flights for each tender and delivery time. The government and intervenors insist that it was therefore irrational for Asia Pacific to believe that it could consolidate all of the mail for a lane on a single flight, thereby eliminating the need for some tender and delivery times. *See* Def.'s Mot. at 28–29; Cross–Mot. of Corporate Air and Alpine at 16–18; Aloha Mem. in Support of Def.'s Mot. at 8–13.

The court does not share the government's and intervenors' interpretation of the Solicitation. The Solicitation and the attendant documents, including the Manual and the transcript of the pre-proposal bidders conference, indicate that Asia Pacific's interpretation was not unreasonable.[12] The plain language of the Solicitation, taken with the Manual and the pre-proposal conference, indicates that the Postal Service was interested in reducing the number of required flights and that there was some flexibility in the schedule included as a "desired" element of the Solicitation.

The Postal Service's Purchasing Manual provides a legal framework for interpretation of the varying terms of the Solicitation. The Manual was promulgated by the Postal Service under the authority granted to it by 39 U.S.C. § 401 and 39 C.F.R. §§ 601.100–05. *See Modern Sys. Tech. Corp. v. United States,* 979 F.2d 200, 202 (Fed.Cir.1992). It was incorporated by reference in the Code of Federal Regulations, 39 C.F.R. §§ 601.100– 05 (2004).[13] "Because of its incorporation by

---

12. Asia Pacific has a history of contracting to carry mail for the Postal Service starting in the year 2000, Tr. 342:13–18 (Test. of Quinn), and currently carries mail for the Postal Service in the Pacific. At the present time, Asia Pacific subcontracts with Continental to carry mail in the Western Pacific between Honolulu and Guam. AR 564 (Asia Pacific's Proposal); Tr. 356:21 to 359:12 (Test. of Quinn). Asia Pacific has also been called upon by the Postal Service on multiple occasions to carry mail on other Pacific routes on a temporary basis. Tr. 363:20 to

364:14 (Test. of Quinn). Asia Pacific, being familiar with many of the Postal Service's air linehauling requirements on other routes in the Pacific, was in a position to understand the Postal Service's requirements in the Solicitation at issue in this case.

13. The Purchasing Manual (Issue 3, revised through Oct. 1, 2004) was in effect when the Solicitation was issued. However, this Manual was revoked and superseded by a notice that

reference in regulations issued pursuant to statutory authority, the [Purchasing] Manual ha[d] the force and effect of law." *See Modern Systems Technology*, 979 F.2d at 202–03 (citing *De Matteo Constr. Co. v. United States*, 220 Ct.Cl. 579, 600 F.2d 1384, 1391 (1979)).[14] The Manual lists the "supplier's offered delivery terms" as an example of "Proposal–Specific Factors" that procurement teams may examine when conducting a solicitation. Purchasing Manual § 2.1.9.b(2)(e). That Section of the Manual in turn refers to Section 2.2.5 of the Manual ("Delivery or Performance Schedule"), which addresses the use of schedules in the procurement process, in the following terms:

Except when clearly unnecessary, solicitations must inform suppliers of the basis of [*sic*] which their proposals will be evaluated in terms of time of delivery or performance. For example, *delivery schedules may be identified as "required" or "desired."* If the delivery schedule is expressed as "desired," the solicitation's performance evaluation factors must indicate the extent to which proposals offering more or less favorable delivery terms will be considered and the relationship of that consideration to the other performance evaluation factors.

Purchasing Manual § 2.2.5.b (emphasis added). The Solicitation at issue in this case referred to the schedule as "desired," *not* "required." AR 58 (Solicitation § 2.2.4). And, as indicated *supra*, at 20–21, statements in the Solicitation were inconsistent in indicating whether that the times listed in the schedule shown in Attachment A of the Solicitation could be varied or were inflexible. If the schedule were in fact "desired," then to be consistent with the requirement of the Purchasing Manual, the Solicitation should have specified "the extent to which proposals offering more or less favorable delivery terms will be considered and the relationship of that consideration to the other performance evaluation factors." *See supra.* The Solicitation did not do so, and thus the Solicitation was flawed as a matter of law. This determination does not, however, end the court's inquiry. As the Federal Circuit opined in *Southfork Systems, Inc. v. United States*, 141 F.3d 1124 (Fed.Cir.1998),

[w]e never have said ... that violation of a statute or regulation constitutes a per se breach of the government's duty to treat all bidders fairly and honestly. Rather, the rule is that a *"proven violation of pertinent statutes or regulation can, but need not necessarily, be a ground for* recovery."

*Id.* at 1134 (emphasis added) (quoting *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1204 (1974)). The question thus becomes whether there are other aspects of the Postal Service's actions that establish error and point to prejudice suffered by Asia Pacific.

### 2. *The Postal Service's consideration of Asia Pacific's posture.*

The inconsistency in the Solicitation and attendant materials regarding the desired schedule carried over into the Postal Service's evaluation of the proposals that were submitted in response to the Solicitation. At least some members of the evaluation team believed that merely proposing a schedule on a lane-by-lane basis was sufficient to qualify an offeror to participate in the Competitive

became effective on May 19, 2005. *See* 70 Fed. Reg. 20,291 (April 19, 2005). The Manual was replaced on a temporary basis with "Interim Internal Purchasing Guidelines," which reportedly will be replaced with new "Supplying Principles and Practices." *See* U.S. Postal Service, *Summary of Changes, available at http://www.usps.com/cpim/ftp/manuals/ipm/html/ ipmsoc.html* (last accessed Oct. 3, 2005).

14. Through a disclaimer in the Purchasing Manual, the Postal Service would seek to circumscribe the extent to which the Purchasing Manual has the force and effect of law:

The policies and procedures established by the P[urchasing] M[anual] are intended to further the objectives expressed herein, but are not intended, and should not be construed, to create any right or benefit, substantive or procedural, enforceable by a party against the Postal Service or the United States, or their officers or employees, except to the extent expressly provided within the P[urchasing] M[anual].

Purchasing Manual § 1.1.1.b.4. The court interprets this caveat to mean that the Postal Service disavows that the Manual creates any implied rights or benefits.

Bidding Event. For example, evaluator Heitzman scored Asia Pacific's schedule "Very Good," stating that "[o]fferor provided lane specific schedules." AR 851 (Evaluation sheet of Gerry Heitzman). Similarly, evaluator Shak rated Asia Pacific's schedule "Very Good," stating that Asia Pacific "presented lane by lane." AR 879 (Evaluation sheet of A. Shak). In all events, the evaluators deemed the proposal submitted by Asia Pacific, including its attached schedules, to be satisfactory because Asia Pacific was qualified to participate in the Competitive Bidding Event.

Moreover, Asia Pacific was not the only offeror that submitted a proposal that proposed single flights to cover multiple tender and delivery times. Another offeror, ABX Air, submitted a proposal that was similar to Asia Pacific's proposal in that it showed a single, larger aircraft (a DC–9) making a single daily round-trip flight on several lanes even though Appendix A of the Solicitation showed multiple tender and delivery times. ABX's proposed schedule showed a single daily round-trip flight for the HNL–LIH, HNL–ITO, HNL–KOA, and HNL–MUE lanes. AR 508 (ABX Air's Proposal (May 13, 2005)). ABX was not invited to participate in the Competitive Bidding Event. *See* AR 296 (E-mail from Michael Leichtman, USPS, to Patricia Jordan, USPS (June 1, 2005)); AR 337–50 (Bidding report from CombineNet (July 7, 2005)). One of the criticisms directed at ABX's proposal by the procurement team was that ABX "[f]ailed to meet the proposed schedule times on 12[sic] lanes— deficient." AR 243, 1112 (Summary evaluation sheet for ABX Air).

Asia Pacific emerged as the low bidder on the HNL–OGG and HNL–ITO routes at the end of the Competitive Bidding Event. *See supra*, at 15. It was only after the Event was concluded that USPS notified Asia Pacific of problems with its schedule. The record indicates that Asia Pacific was eliminated from consideration even as Asia Pacific's management was seeking meetings with officials of the Postal Service to try to work out new schedules and what the schedules in the Solicitation meant. Tr. 365:25 to 366:7, 401:3 to 402:3 (Test. of Quinn). Section 4.2.5.c of the

Purchasing Manual (entitled "Discussions") states that "[s]uppliers whose offers are the subject of discussion *at any stage* must be given *sufficient time to revise their proposals* in light of those discussions. The time provided must be reasonable in view of the complexity and extent of the issues discussed." Purchasing Manual § 4.2.5.c(3)(c) (emphasis added). As indicated previously, Asia Pacific was notified of its elimination from the Solicitation approximately fourteen days after it initially received notification from USPS employees that its schedule was not sufficient, and prior to its disqualification, it was not given an opportunity to learn that the Postal Service's schedule set out in the Solicitation was in fact mandatory and then to adjust to that fact.

The Postal Service's posture regarding the mandatory nature of the schedule was not made manifest until Ms. Powell submitted her declaration in this action on August 15, 2005, three months after Asia Pacific had been disqualified. *See* Def.'s Mot.App. (Decl. of Christine Powell (Aug. 15, 2005) ("Powell Decl.")). Subsequently, Ms. Powell reiterated and elaborated on the substance of her declaration in testimony given during the trial of equitable issues in the case. Ms. Powell explained that she had spent a month in Hawaii reviewing the mail-handling process for U.S. mail sent between and among the Hawaiian Islands and developing the criteria for the Purchase Plan for the Solicitation and for the Solicitation itself. Tr. 131:14 to 134:7 (Test. of Powell); Powell Decl. ¶¶ 2– 3.

The Postal Service's outgoing mail on an island other than Oahu is collected by a post office on that island and delivered to that island's airport or airports. Tr. 136:3–14, 155:22 to 156:8, 159:7 to 160:5 (Test. of Powell). The mail is tendered to a ground handling crew at that airport at some point in the afternoon. The ground handling crew in turn loads the mail onto an aircraft. The aircraft ferries the mail to the Honolulu airport, where a ground crew unloads the mail and tenders it to USPS. The USPS has a central processing facility in Honolulu that processes all mail transmitted to, from, and within the Hawaiian Islands. Tr. 136:11–16,

153:21 to 154:13 (Test. of Powell). The Honolulu facility processes all of the intra– and inter-island mail, as well as incoming mail from the continental U.S. Tr. 136:11–16, 153:21 to 154:13 (Test. of Powell).

Ms. Powell explained at trial that delivery time at the Honolulu facility is critical. All mail must be received by this facility by approximately 8:00 p.m. to be timely processed (the "critical entry time"). Tr. 134:12–16, 136:15–22, 154:14 to 155:2 (Test. of Powell). That processing is completed in the early morning, at approximately 12:30 a.m. (the so-called "clearance time"), Tr. 134:14–16, 155:3–9, and the Honolulu facility "tenders" mail for each other island to ground handlers at the Honolulu airport, who load the mail onto aircraft. Tr. 163:3–20, 164:11–18. The aircraft then ferry the mail to the other islands, where it is unloaded by ground handlers and delivered to local post offices for distribution to route carriers. Tr. 136:21 to 137:8. Ms. Powell emphasized that the mail must be delivered to these post offices by a certain time in the morning for the mail to be timely distributed to the route carriers for delivery to customers. Tr. 138:25 to 139:18.

In sum, the Postal Service's actions in eliminating Asia Pacific from consideration for an award of a contract were arbitrary and capricious. After first qualifying Asia Pacific for the Competitive Bidding Event based upon its original proposal, and then allowing Asia Pacific to submit further pricing bids during the electronic Bidding Event with the apparent result that Asia Pacific was the winner of a contractual award respecting the two largest lanes involved in the Solicitation, it subsequently was arbitrary and capricious for the Postal Service to disqualify Asia Pacific from any award based upon an interpretation of the scheduling provisions in the Solicitation that it refused to discuss with, or to clarify for, Asia Pacific. *See* Purchasing Manual §§ 4.2.5.c ("The final stage of discussions is reaching agreement on the contract's terms and conditions with the apparently

successful supplier.... [D]uring this stage any remaining issues should be addressed and revised."), 4.2.5.c(3)(c) ("all suppliers must be treated fairly"). *Cf. Information Technology*, 316 F.3d at 1320–23 (applying the distinction between "minor clarification" and "discussion" in the Federal Acquisition Regulations as amended in 1997 to evaluate the fairness of communications with one offeror).[15]

### E. The Flawed Solicitation Resulted in Prejudice to Asia Pacific's Position

■ To prevail, Asia Pacific must also demonstrate that it was prejudiced by the Postal Service's conduct in the procurement. *Bannum*, 404 F.3d at 1351. In that regard, Asia Pacific must show that "there was a 'substantial chance' it would have received the contract award but for [the Postal Service's] errors in the bid process." *Id.* at 1358 (internal citations omitted). This court must make its determination regarding prejudice based on evidence in the record, not mere speculation by the plaintiff that it might win if there were to be a re-solicitation. *Id.* at 1357–58. In the case at hand, the facts in the record demonstrate that Asia Pacific was substantially prejudiced by the Postal Service's errors. In preparing its proposal, Asia Pacific construed the Solicitation to provide substantial flexibility in the schedules that offerors could submit. Asia Pacific's President, Michael Quinn, testified at trial that Asia Pacific based its bidding strategy around the premise that it could carry all of the mail for a given lane in one trip with a large plane. *See supra*, at 13. Proceeding on that premise, Asia Pacific was invited to participate in the Competitive Bidding Event, and at no time prior to that event was Asia Pacific notified by the Postal Service that its proposed schedules were unsatisfactory. Tr. 350:7–17 (Test. of Quinn). When during the Competitive Bidding Event, Asia Pacific emerged as the low bidder on two of the lanes, there were no indications that Asia Pacific would be disqualified. *See supra*, at

15. The Purchasing Manual defines "discussions" to

include all communications held with suppliers during the purchasing process; the term "discussions" is used in this P[urchasing]

M[anual] in its common dictionary sense, and not as defined or circumscribed in previous Postal Service purchasing regulations or similar regulations of other Federal agencies.

Purchasing Manual, § 4.2.5.c.

15. Thereafter, the Postal Service raised the issue of schedules, and Asia Pacific responded by proposing new schedules and seeking meetings with officials of the Postal Service to try to work out agreeable new schedules. *See supra*, at 15. The refusal of the Postal Service representatives to meet with Asia Pacific and the Service's subsequent elimination of Asia Pacific from consideration for a contract award establish that Asia Pacific was significantly prejudiced by the Postal Service's flawed Solicitation.

Asia Pacific was also significantly prejudiced with regard to the four lanes on which it did not bid. As Mr. Quinn testified at trial, Asia Pacific's business plan relied on securing inter-island Hawaiian routes. Tr. 354:6 to 355:8, 358:14 to 359:25 (Test. of Quinn). The Postal Service's linked bidding option for the Competitive Bidding Event strongly influences this analysis. To compete for line haul of mail in this market, Asia Pacific could have pursued a bidding strategy that involved bidding on some of the other lanes had Asia Pacific not been misled regarding the scheduling requirements in the Solicitation. For example, Asia Pacific could have sought to join its efforts with one of a number of airlines that fly smaller planes in the Hawaiian market. Tr. 402:1 to 403:13 (Test. of Quinn). Asia Pacific's ability to compete effectively for a contract in response to the Solicitation was compromised by the Postal Service's inconsistent provisions in the Solicitation respecting scheduling, by its pre-proposal commentary that seemed to support Asia Pacific's interpretation of the Solicitation's terms, and by the Postal Service's initial qualification of Asia Pacific to participate in the Competitive Bidding Event and its subsequent disqualification of Asia Pacific despite Asia Pacific's having ostensibly prevailed in the Bidding Event. The Postal Service aggravated this prejudicial posture insofar as Asia Pacific was concerned by ostensibly providing Asia Pacific with an opportunity to provide revised schedules that accorded with the Postal Service's wishes, but then refusing to meet with Asia Pacific to clarify what the Postal Service actually wanted by way of schedules. Tr. 365:25 to 366:11, 401:3 to 402:3 (Test. of Quinn). In these circumstances, the Postal Service's action in eliminating Asia Pacific from consideration for a contractual award was arbitrary and capricious within the meaning of 5 U.S.C. § 706. That the Postal Service's actions contravened the Administrative Procedure Act is demonstrated in explicit terms by Ms. Powell's declaration filed August 15, 2005, nearly three months after Asia Pacific had been disqualified. Only upon the filing of that declaration was the rationale applied by the Postal Service to the Solicitation and to Asia Pacific's bid made apparent.

### F. Equitable Relief

■ At trial on equitable issues, the parties focused primarily upon Asia Pacific's request that the Postal Service be required to re-solicit all six lanes. *See, e.g.*, Tr. 55:17–24, 462:12 to 465:18. Asia Pacific's requests for injunctive relief would bar USPS from awarding contracts to the current low bidders on the lanes other than the two it had appeared to win and would mandate a new round of solicitation, proposals, evaluations, and subsequent awards. To obtain this and any other injunctive relief, Asia Pacific must show (1) success on the merits of its challenge, (2) that Asia Pacific would suffer irreparable harm if relief were not awarded, (3) that granting an injunction would serve the public interest, and (4) that the harm Asia Pacific would suffer outweighs the harm that the government, intervenors, and other third parties would suffer. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir.2004). Asia Pacific has made a successful showing on the merits of its challenge, and the dispute centers on the nature of the equitable relief, if any, to be awarded.

Asia Pacific has made a showing that it will suffer substantial harm if it is not able to participate in a fair competition for Hawaiian mail hauling business. Mr. Quinn testified that Asia Pacific is currently being pressed financially, largely due to declining volume in its current mail-hauling business as well as escalating fuel costs. Asia Pacific's current major contract to carry mail between Honolulu and points in the Western Pacific including Guam is becoming less and less profitable as mail volumes decline and costs escalate. Mr. Quinn pointed out that Asia Pacific's current routes cover long distances and

therefore are vulnerable to swings in fuel prices. Tr. 354:6–13 (Test. of Quinn).[16] He also indicated that Asia Pacific has excess capacity because it acquired an additional 727 aircraft to carry increased mail shipments that never materialized. Tr. 358:1 to 359:12 (Test. of Quinn). Mr. Quinn reported that the volumes on its Honolulu–Guam route have declined to the point that at the direction of the Postal Service Asia Pacific now flies this route only twice a week, rather than four times a week as originally envisioned. *Id.* As a result of this decreased volume and USPS's unwillingness to reimburse carriers for increased fuel costs, Asia Pacific has expressed an interest in exiting or renegotiating this contractual relationship. Tr. 354:14–18, 356:21 to 359:12 (Test. of Quinn). Mr. Quinn expressed doubt that Asia Pacific can survive without winning a portion of the Hawaiian islands mail carriage. Tr. 355:3–8 (Test. of Quinn). Based upon this showing, Asia Pacific has demonstrated that it would suffer irreparable harm if equitable relief were to be withheld.

The same factors that have adversely affected Asia Pacific's financial situation have also been visited upon the intervenors. Aloha Airlines is and has been in financial distress to the point that it has filed for bankruptcy and is operating as a debtor-in-possession of its assets under the supervision of a bankruptcy court. Mr. Coffman, Aloha's Vice President, Cargo & Contract Services, testified that Aloha is currently seeking to attract equity investors to support reorganization of the airline. Tr. 313:21 to 314:3 (Test. of Coffman). Mr. Coffman testified that award of the HNL–KOA contract would represent the kind of steady, revenue-generating traffic that might attract potential equity investors. Tr. 314:12–16. Aloha has both a passenger division with scheduled passenger services serving the Hawaiian islands as well as a cargo division. AR 456 (Aloha Airlines' Proposal). Prior to Alpine's inter-island carriage of mail for the Postal Service, Aloha had that contract. Tr. 312:6 to 313:14 (Test. of Coffman). Mr. Coffman testified

that Aloha has four 737 cargo aircraft, *see* AR 457 (Aloha Airlines' Proposal), one of which is convertible from cargo to passenger haulage. Tr. 336:21 to 337:3 (Test. of Coffman). Aloha adamantly opposes a re-solicitation of all six routes. Besides the costs that would be incurred in participating in a resolicitation, Aloha claims that the public nature of the earlier auction process will set a "ceiling" on the prices it would be able to bid should a resolicitation occur. Aloha Mem. in Support of Def.'s Mot. at 14–15.

Similarly, Corporate Air and Alpine have shown that they will suffer significant harm if they are not awarded any contract under the Solicitation. They focus particularly on HNL–LIH, HNL–MUE, and HNL–LNY–MKK–LUP lanes, the lanes on which [* * * *]. Tr. 433:2 to 435:23 (Test. of Mallette). Alpine currently provides USPS with line-haul service on all the Hawaiian islands routes, and Corporate Air functions as a subcontractor to Alpine in fulfilling this contract. Tr. 439:23 to 440:4 (Test. of Mallette). As noted *supra*, at 11 n. 7, Alpine claims that [* * * *] to continue performing its current contract. Mr. Mallette, Alpine's President, testified that [* * * *] for purchase of fuel and other necessary supplies. Tr. 434:7 to 435:1 (Test. of Mallette). Moreover, if [* * * *]. Mr. Mallette maintains that Alpine's business prospects [* * * *]. Cross–Mot. of Corporate Air and Alpine, Exh. C, Declaration of Eugene Mallette ("Mallette Decl."), ¶ 8. Mr. Mallette testified that if Alpine failed to win the three lowest-volume routes, [* * * *]. *Id.* ¶ 9; Tr. 435:24 to 436:14 (Test. of Mallette). Alpine would also be forced to [* * * *]. Mallette Decl. ¶ 10. Additionally, [* * * *]. *Id.* ¶ 12; Tr. 436:5–7 (Test. of Mallette). Corporate Air's Senior Vice President of Administration, Patrick Pomeroy, submitted an affidavit stating that Corporate Air, [* * * *] in its ability to purchase fuel. Cross–Mot. of Corporate Air and Alpine, Ex. D, Declaration of Patrick Pomeroy ("Pomeroy Decl."), ¶ 9. Mr. Pomeroy maintains that Corporate Air will operate

---

16. Mr. Quinn indicated that Asia Pacific also provides air cargo services hauling "chilled tuna, . . . general freight and food to most of the island nations in the Pacfic." Tr. 342:8–12 (Test. of Quinn).

[* * * *]. *Id.* ¶ 6. Absent a contract for the three lowest-volume routes, [* * * *]. *Id.* ¶ 7.

Overall, perhaps because of the distressed state of the airline industry, it is apparent that the intervenors as well as Asia Pacific have suffered harm that may be alleviated in part through completion of the solicitation.

Respecting the public interest underlying an injunction, it is well-established that the public interest is well-served by ensuring that the government procurement process is fair. *See Doty v. United States,* 53 F.3d 1244, 1251 (Fed.Cir.1995) (citing *Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)). The public also has an important interest in the effective and efficient operation of the Postal Service; disrupting and delaying the delivery of mail could affect thousands of Hawaiians who rely on prompt and accurate mail delivery. Ms. Powell and Mr. Griffith testified at trial that transportation problems during the last quarter of the year would be particularly troublesome because mail volumes tend to increase dramatically as the Holiday season approaches. Tr. 141:14 to 142:22 (Test. of Powell), 170:12–19 (Test. of Griffith).

In a bid protest case, 28 U.S.C. § 1491(b)(2) provides that "[t]o afford relief in such an action, the court[ ] may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." Balancing the hardships between Asia Pacific on the one hand the government and intervenors on the other, the court determines that Asia Pacific and intervenors have been harmed by a flawed, inconsistent Solicitation and by the Postal Service's arbitrary actions in implementing that Solicitation. To insure that the procurement is conducted in a fair and equitable manner, the Postal Service is enjoined to discard the results of the existing Solicitation and to initiate a new solicitation that specifies those aspects of the proposed procurement that it deems to be mandatory and those that it considers to be desirable but not mandatory.

The court bases its decision on a number of equitable factors. First, re-solicitation is unlikely to prevent the mail from being delivered on a timely basis. Alpine's President, Mr. Mallette, indicated that the airline would be inclined to extend its contract beyond October 7 if it was asked to do so. Tr. 440:5–24 (Test. of Mallette). Furthermore, Mr. Griffith testified that if Alpine were no longer able or willing to carry the mail between and among the islands, he could probably find a company to do so, even though the process would be "cumbersome" and the Postal Service would "probably pay extremely high rates." Tr. 171:9 to 172:24 (Test. of Griffith). Second, it would be extremely difficult for USPS to determine a "winner" of the auctions for the two lanes on which Asia Pacific was the low bidder (HNL–OGG and HNL–ITO) in the Competitive Bidding Event because of the difficulty of "reconstructing" the parties' bids during the auction process. Mr. Griffith, who has overseen the solicitation process to date, *see* Tr. 168:19 to 169:6 (Test. of Griffith), expressed doubts as to whether he would be able to declare winners for those two lanes based on the history of the online Competitive Bidding Event. Tr. 188:15 to 199:10 (Test. of Griffith). If the Postal Service were unable to determine a winner from this process, this would require a re-solicitation of the HNL–OGG and HNL–ITO lanes in any event. Third, Mr. Griffith testified that the Postal Service might be able to conduct a re-solicitation of all the routes in as little as thirty days. Tr. 200:13 to 201:7 (Test. of Griffith). Such a relatively short delay in awarding contracts should not prove to be an undue hardship on those carriers that are ultimately selected or on the Postal Service, given the public interest in a fair procurement process and in the selection of vendors that are capable of performing the contract at the lowest cost to the Postal Service. Those carriers which do not receive an award or awards will suffer financial harm, not as a result of this decision, but rather as a result of a fair process. Fourth, it may not be necessary for the Postal Service to issue a new Solicitation for proposals regarding the smallest two lanes in terms of volume (HNL–MUE and HNL–LNY–MKK–LUP). On these lanes, it is not practical to use large planes, Tr. 446:24

to 447:14 (Test. of Mallette), and among the parties to this case only Corporate Air and Alpine appear to have planes of the requisite smaller size to operate efficiently on these lanes. Tr. 447:22 to 448:13 (Test. of Mallette), AR 374 (Corporate Air's Proposal). The court accordingly grants leave to the Postal Service to exercise its discretion whether to issue contracts now for those lanes or whether to include them in a re-solicitation.

## CONCLUSION

For the reasons set forth above, the government's motion to dismiss is DENIED, Asia Pacific's motion for judgment upon the administrative record is GRANTED, and the government's and intervenors' cross-motions for judgment upon the administrative record are DENIED. Asia Pacific is entitled to injunctive relief. The results of the current Solicitation are set aside and declared invalid. The Postal Service is enjoined to re-solicit proposals for the transportation by air of mail on each of the six lanes encompassed by the Solicitation, except that the court grants leave to the Postal Service to exercise discretion whether to issue contracts for the Honolulu (HNL)—Kamuela (MUE) and Honolulu (HNL)—Lanai (LNY)—Hoolehua (MKK)—Kalaupapa (LUP) lanes, or to include those lanes in its re-solicitation.

Because this decision might contain "confidential or proprietary information" within the meaning of RCFC Appendix C, ¶ 4, it is being issued under seal. The parties are requested to review the decision and to file proposed redactions on or before October 12, 2005.[17]

The Clerk shall enter final judgment as specified above.

17. Pending procedural motions are resolved as follows: (1) Asia Pacific's motion to strike declarations, filed September 6, 2005, is DENIED, (2) the motion by intervenors Corporate Air and Alpine to supplement the administrative record, filed September 7, 2005, is GRANTED, (3) the motion by Asia Pacific to supplement the administrative record, filed on September 23, 2005, is GRANTED, and (4) the motion by Asia Pacific for leave to file original declaration, filed September 23, 2005, is GRANTED. These motions relate to declarations and other materials that primarily

No costs.

It is so ORDERED.

bear on the appropriateness of equitable relief, not on the procurement itself. Thus, although they are procedurally improper as "supplementation" of the administrative record of the procurement, they are appropriate for consideration by the court in considering the factors bearing on injunctive relief. See Bannum, 404 F.3d at 1357; PGBA, 60 Fed.Cl. at 204 n. 11 and 221 n. 28.

